UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARTA ESCAMILLA,
        Plaintiff,


        v.                                          CIVIL ACTION NO. 22-11001-MPK[1]

DYCK-O'NEAL, INC. and
BENDETT & MCHUGH, P.C.,
        Defendants.

MEMORANDUM AND ORDER ON DEFENDANTS' JOINT MOTION FOR
JUDGMENT ON THE PLEADINGS (#42)

KELLEY, U.S.M.J.

I. Introduction.

        Plaintiff Marta Escamilla alleges defendants Dyck-O'Neal, Inc. ("DONI") and Bendett &

McHugh, P.C. ("BMPC") violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C.

§§ 1692f, 1692g, and the discharge injunction, 11 U.S.C. § 524(a). (#27.) Plaintiff claims that

letters that defendants sent to plaintiff were an attempt to collect a discharged debt and to enforce

a non-existent lien stemming from a defaulted second mortgage loan. The debt had been discharged

in bankruptcy and plaintiff claims the lien was "stripped off" in the bankruptcy case. At this stage,

defendants do not dispute that the loan was "stripped." *See*, *e.g.*, #27 ¶¶ 65-66; *see also* #43 at 4

---

[1] The parties have consented to the assignment of this case to the undersigned for all purposes,
including trial and entry of final judgment, pursuant to 28 U.S.C. § 636(c). (#12.)

n.2.[2] Defendants filed a joint motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). (#42); *see* #43, memorandum, #50, reply; #46, opposition. The court held two hearings and invited supplemental briefing after the second. *See* #67, transcript of March 5, 2024 hearing; #68, transcript of April 2, 2024 hearing; #62, e-notes from April 2, 2024 hearing. The parties filed supplemental briefing. *See* ##64, 65.

Plaintiff's allegations are sparse. As mentioned, defendants presently do not dispute that the second mortgage lien was stripped off in the bankruptcy proceeding.[3] Given that assumption, the facts do not establish that defendants are entitled to the relief sought. The Rule 12(c) motion is therefore <u>DENIED</u>.

---

[2] Generally, "[a] bankruptcy discharge extinguishes only one mode of enforcing a claim – namely, an action against the debtor *in personam* – while leaving intact another – namely, an action against the debtor *in rem*." *Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991); *see Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 21 (1st Cir. 2002). A surviving lien remains enforceable unless it is avoidable and the debtor takes proper steps to avoid it during the bankruptcy proceeding. *Arruda*, 310 F.3d at 21. "Strip off" in this context means "the entry of a confirmation order that discharges a creditor's mortgage lien on real property where the creditor's mortgage is determined to have no value because the amount of senior liens and encumbrances exceeds the value of the property." *In re Guerra*, #16-bk-40121-CJP, 2017 WL 1190604, at *1 n.1 (D. Mass. 2017); *see id*. at 2 n.4 ("strip down," in turn, means "reducing the value of the creditor's mortgage lien to the value of the real property in excess of senior liens and encumbrances"); *see In re Mann*, 249 B.R. 831, 832 n.1 (BAP 1st Cir. 2000). "Strip off" avoids the lien and the creditor no longer has the ability to pursue an action against the debtor *in rem*. *In re Fissette*, 455 B.R. 177, 187 n.9 (BAP 8th Cir. 2011); *see In re Alvarez*, 733 F.3d 136, 139 (4th Cir. 2013).

[3] Specifically, defendants state:

> …[T]o comply with the standard of review for this motion, the [d]efendants acknowledge that the bankruptcy court issued the October 27, 2011 order [confirming plaintiff's amended Chapter 13 plan] and take as true [p]laintiff's allegation that the order stripped the Carrington [second mortgage] Loan of its security, although no discharge of the mortgage was recorded in the Registry.

(#43 at 4 n.2.)

II. <u>Procedural History</u>.

Plaintiff filed the original complaint on June 24, 2022. (#1.) After defendants filed a motion to dismiss, plaintiff filed a motion to amend. (##7, 13.) Before the court ruled on either of those motions, plaintiff filed a second motion to amend, to add class action claims. (#15.) The court granted plaintiff's first motion to amend. (#26.) Plaintiff's first amended complaint (#27) ("FAC") is the operative complaint. Defendants have filed answers. (##30, 31.) At a hearing on the second motion to amend on October 26, 2023, the court denied that motion without prejudice to renewal after resolution of the motion for judgment on the pleadings. *See* #66, transcript of October 26, 2023 hearing, at 16; *see also* #39.

III. <u>The Standard of Review and the Record</u>.

Fed. R. Civ. P. 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." *Id*. The court raised an issue regarding the proper standard of review, (#60), which the parties addressed at the April 2, 2024 hearing, *see* #68 at 4-7, and in their supplemental briefing, *see* #64 at 1-3; #65 at 1-3.

In *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007), clarifying the proper standard of review on a Fed. R. Civ. P. 12(b)(6) motion to dismiss for the "failure to state a claim upon which relief can be granted," *see id.*, the Supreme Court "retire[d]" the following language from *Conley v. Gibson*, 355 U.S. 41 (1957):

> …[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Twombly*, 550 U.S. at 561, 563 (quoting *Conley*, 355 U.S. at 45-46). Similar language appeared in some of the First Circuit's pre-*Twombly* decisions under Rule 12(c) and still appears in some of its post-*Twombly* Rule 12(c) decisions. *Contrast Rezende v. Ocwen Loan Servicing, LLC*, 869 F.3d

40, 42 (1st Cir. 2017); *Díaz-Nieves v. United States*, 858 F.3d 678, 689 (1st Cir. 2017); *Curran v. Cousins*, 509 F.3d 36, 43 (1st Cir. 2007) *with Zipperer v. Raytheon Co., Inc.*, 493 F.3d 50, 53 (1st Cir. 2007) (quoting *Aponte-Torres v. Univ. of. P.R.*, 445 F.3d 50, 54 (1st Cir. 2006)).

    The *Twombly* Court explained that *Conley*'s "no set of facts" language is

> …best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. … *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.

*Twombly*, 550 U.S. at 563 (internal citations and footnotes omitted). The *Twombly* Court listed the First Circuit among the "judges and commentators [who] have balked at" reading the *Conley* "no set of facts" language literally as a pleading standard. *Remexcel Managerial Consultants, Inc. v. Arlequin*, 583 F.3d 45, 54 (1st Cir. 2009) (quoting *Twombly*, 550 U.S. at 562) (citing *O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976))). Thus, *Conley*'s "no set of facts" language is not a minimum standard of adequate pleading, *see Twombly*, 550 U.S. at 563, and a court cannot deny a Rule 12(b)(6) (or a Rule 12(c)) motion on "the remote possibility that plaintiffs would eventually show some unknown set of facts to support their claim," *see Remexcel*, 583 F.3d at 54.

    Rule 12(c) motions are treated like Rule 12(b)(6) motions, and the First Circuit has applied the familiar "plausibility" standard to them: "To survive a motion for judgment on the pleadings, a complaint must allege sufficient facts to 'state a claim to relief that is plausible on its face.'" *Sevelitte v. Guardian Life. Ins. Co. of Am.*, 55 F.4th 71, 79 (1st Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (quoting *Twombly*, 550 U.S. at 570)); *see Kando v. R.I. State Bd of Elec.*, 880 F.3d 53, 63 (1st Cir. 2018). "Those factual allegations cannot be meager, vague, or conclusory, leaving the plaintiff's claim largely within the realm of conjecture." *Kando*, 880 F.3d at 63 (cleaned up) (citation omitted); *see Sevelitte*, 55 F.4th at 79.

On both Rule 12(b)(6) and Rule 12(c) motions, the court views the well-pleaded facts and the reasonable inferences drawn from them in the light most favorable to the nonmovant, here, plaintiff. *Kando*, 880 F.3d at 58. A Rule 12(c) motion, however, "implicates the pleadings as a whole." *Aponte-Torres*, 445 F.3d at 54-55. New facts in an answer, to which no responsive pleading is required, are deemed denied. *Kando*, 880 F.3d at 58. The court may include facts from documents that are fairly incorporated into the pleadings as well as those that are susceptible to judicial notice. *Id.*; *see Sevelitte*, 55 F.4th at 76. The court may properly consider the "relevant entirety" of incorporated documents. *See Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (Rule 12(b)(6)); *LaMarche v. Met. Life Ins. Co.*, 236 F. Supp. 2d 50, 54 (D. Me. 2002) (Rule 12(c)).

Defendants submit exhibits that were not attached to the pleadings.[4] Exhibit A (#43-1) is the docket sheet in United States Bankruptcy Court for the District of Massachusetts #10-bk-12071. Exhibit B (#43-2) is the discharge order, *see* #10-bk-12071, #65. The court may take judicial notice of relevant proceedings in other courts. *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990). Exhibits A and B are properly part of the record.

Defense counsel proffer that Exhibit H (#43-8) is a model Consumer Financial Protection Bureau ("CFPB") form. (#43 at 6.) The court has found a copy of this "Debt Collection Model Form: Model Validation Notice" on the CFPB's website.[5] In the absence of an objection from plaintiff, the court takes judicial notice of the fact that the Model Validation Notice "exist[s] [and]

---

[4] Plaintiff objects only to Exhibit E. (#46 at 9-10 & n.2.)

[5] *See* https://files.consumerfinance.gov/f/documents/cfpb_debt-collection_model-validation-notice_english.pdf  (last visited July 8, 2024).

contain[s] certain information….” *Pietrantoni v. Corcept Therapeutics Inc.*, 640 F. Supp. 3d 197, 205 (D. Mass. 2022).

Exhibits D, F, G, and I are clearly incorporated into the pleadings and therefore properly part of the record. *Compare* #43-4 (Ex. D) (DONI's June 25, 2021 letter) *with* #27 ¶ 29 (allegations about this letter); *compare* #43-6 (Ex. F) (DONI's October 18, 2021 letter) *with* #27 ¶ 30-32 (allegations about this letter); *compare* #43-7 (Ex. G) (BMPC's April 1, 2022 letter) *with* #27 ¶¶ 34-41 (allegations about this letter); *compare* #43-9 (Ex. I) (BMPC's April 4, 2022 letters) *with* #27 ¶¶ 42-44 (allegations about these letters); *see also* #30 ¶¶ 29-32, 34-40, 42-44; #31 ¶¶ 29-35, 37-40, 42-44.

Exhibit C (#43-3) is fairly incorporated into the pleadings. Plaintiff alleges, and DONI and BMPC admit, that the second mortgage loan was transferred to DONI. (#27 ¶ 10; #30 ¶ 10; #31 ¶ 10.) Exhibit C is DONI's April 27, 2021 letter to plaintiff notifying her of the transfer. (#43-3 (Ex. C) at 2.)

The court has ruled that it will not convert the Rule 12(c) motion to a Fed. R. Civ. P. 56 motion for summary judgment. (#67 at 12.) The court agrees with plaintiff's counsel, *see id.* at 4-5, that defense counsel's proffer regarding Exhibit E (#43-5) is unsupported.[6] Regardless, the court does not find that Exhibit E is fairly incorporated into the pleadings. It is more accurate to characterize plaintiff's putative request for a payoff amount to which DONI allegedly responded

---

[6] Defense counsel proffer that Exhibit E was a request from plaintiff, on May 11, 2021, for a payoff amount to which DONI, on June 25, 2021, responded with a payoff amount, i.e., through Exhibit D. (#43 at 5; #50 at 1.) The proffer is not supported by affidavit. Exhibit E, titled "Authorization to Release," merely states that plaintiff "give[s] [her] authorization to release information to Brian Lindmark of Total Mortgage on behalf of the refinance of [her] home," and instructs that all documentation be emailed to him. (#43-5 (Ex. E) at 2.)

with a payoff amount as "integral" to defendants' claims rather than those of the plaintiff. *See* #50 at 1.

> The Rule 12(c) standard requires the court
>
> to separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).... Judgment on the pleadings should be allowed only if the properly considered facts conclusively establish that the movant is entitled to the relief sought.

*Kando*, 880 F.3d at 58 (cleaned up) (citation omitted).

## IV. Factual Allegations.

Plaintiff defaulted on her second mortgage in 2008, while the loan was being serviced by Carrington Mortgage Services, LLC. (#27 ¶ 9.) In 2010, plaintiff filed a Chapter 13 petition in the United States Bankruptcy Court for the District of Massachusetts, #10-bk-12071. *See* #27 ¶ 12; *see also* #43-1 (Ex. A) at 2.[7] Plaintiff listed Carrington as a creditor in the creditor matrix. (#27 ¶ 13.)[8]

In 2011, plaintiff filed an amended Chapter 13 plan. *See* #27 ¶ 14; *see also* #43-1 (Ex. A) at 4.[9] Plaintiff alleges that Part V of the amended plan stated:

> ***CLAIM DUE TO CARRINGTON MORTGAGE SERVICES (Carrington). Carrington is wholly unsecured and shall be paid in accordance with the unsecured claims in the plan. The Debtor's residence located at 205 Ferry Street #103 Everett, MA 02149 has a present value of $145,000. The Debtor's residence is subject to the first mortgage to Ocwen Loan Servicing Loan. The balance due to Ocwen Loan Serving Loan as of the date of the filing of the petition for relief was $182,934.00. Carrington is the holder of the second mortgage. The amount due to DFCU at the

---

[7] The Chapter 13 petition is #10-bk-12071, #1. There are inconsequential differences between some of the quotations from the bankruptcy pleadings and orders in the FAC and the actual language of those documents.

[8] *See* #10-bk-12071, #1 at 24.

[9] Plaintiff mistakenly alleges that the amended Chapter 13 plan was filed in 2021. *See* #27 ¶ 17. That plan, filed on May 17, 2011, is #10-bk-12701, #21.

time of the filing of the petition was $45,000.00 Pursuant to 11 USC 1322(b)(2) this plan provides to modify the claim due Carrington and treat such claim as an unsecured claim in its entirety. The Order of Discharge to be entered in this case under 11 USC 1328(a) shall constitute a discharge of the mortgage held by Carrington and described hereinabove.

(#27 ¶ 15.)[10] A certificate of service for the amended plan was filed indicating that it was served

on all creditors, including Carrington. *Id*. ¶ 16.[11]

Later in 2011, the bankruptcy court issued an order confirming the amended plan. *Id*. ¶

17.[12] Plaintiff alleges that under "MODIFIED SECURED CLAIMS," the order stated:

The Debtor is modifying the secured claim of <u>Carrington Mortgage Services</u> with respect to the second mortgage on the real estate located <u>at 205 Ferry Street, #103, Everett, MA</u> as follows: <u>Carrington Mortgage Service's</u> claim in the sum of <u>$45,000</u> will be wholly unsecured and treated with the other unsecured creditors under Section 5 below. The order of discharge to be entered in this case under <u>11 U.S.C. Sec. 1328(a)</u> shall constitute a discharge of the mortgage.

*Id*. ¶ 18.[13]

In 2012, plaintiff was required to file a post-confirmation Chapter 13 plan. *Id*. ¶ 19.[14] Part

V of the post-confirmation plan included substantively the same language regarding the treatment

of the second mortgage, quoted above, as Part V of the amended plan. *See id*. ¶ 20.[15] A certificate

---

[10] *See* #10-bk-12071, #21 at 3.

[11] *See* #10-bk-12071, #21 at 5, 6.

[12] The October 27, 2011 order is #10-bk-12071, #30.

[13] *See* #10-bk-12071, #30 at 2.

[14] The July 12, 2012 post-confirmation plan is #10-bk-12071, #38.

[15] *See also* #10-bk-12071, #38 at 3.

of service for the post-confirmation plan was filed indicating that it was served on all creditors, including Carrington. *Id.* ¶ 21.[16]

Later in 2012, the bankruptcy court issued an amended order confirming the post-confirmation plan. *Id.* ¶ 22.[17] Plaintiff alleges that while the amended plan noted provisions of the court's previous order that were amended, it did not state that the treatment of the second mortgage would be amended. *Id.* ¶ 23.[18] Accordingly, the second mortgage "would still be treated as an unsecured claim and upon discharge, would be discharged." *Id.* ¶ 24.

In 2013, plaintiff received a discharge order. *Id.* ¶ 25; *see* #43-2 (Ex. B).[19] Plaintiff alleges that the order discharged her debts, including Carrington's now unsecured claim. (#27 ¶ 26.) Further, upon the discharge order, "there was no longer a second mortgage on the property, as the previously held second mortgage was discharged as an unsecured debt." *Id.* ¶ 28. The FAC subsequently refers to an "alleged lien" that was "not valid" as a result of the discharge order. *Id.*

---

[16] *See* #10-bk-12071, #38 at 5, 6.

[17] This October 9, 2012 amended order is #10-bk-12071, #47.

[18] *See* #10-bk-12071, #47 at 1.

[19] The June 27, 2013 discharge order is #10-bk-12071, #65.

¶¶ 51, 54. Plaintiff does not allege that the discharge order was recorded in the appropriate Registry of Deeds.[20]

Plaintiff alleges that at the time of default, the second mortgage loan was being serviced by Carrington and that sometime after, it was transferred to DONI. *See* #27 ¶¶ 9-10; *see also* #30 ¶ 10; #31 ¶ 10. On April 27, 2021, DONI sent plaintiff a letter stating "[t]he ownership and servicing of your former Carrington Mortgage Services, LLC mortgage loan is being transferred to" DONI, "effective" May 1, 2021. (#43-3 (Ex. C) at 2.) The letter further stated that the "principal balance at the time of transfer is $67,220.62...." *Id*. The letter instructed that before May 1, payments be sent to Carrington but after May 1, payments and correspondence be sent to DONI. *Id*.

> The April 27, 2021 letter also stated:
>
> This letter is for information purposes only. This letter is not a demand for payment or a request for payment of any funds previously discharged in bankruptcy or subject to an automatic stay. If you have filed for bankruptcy protection and your loan is either subject to the automatic stay of collection efforts or *has been discharge [sic] in bankruptcy and is no longer owing, please call our bankruptcy specialist, Cory Faulkner, at 1-800-447-2481 ext. 2101.*

*Id*. (emphasis added).

Plaintiff alleges that sometime after the transfer, BMPC began attempting to collect on the alleged debt. (#27 ¶ 11.) DONI admits that "at some point, [DONI] engaged BMPC in relation to

---

[20] The court acknowledges defense counsel's proffer that the discharge order was not recorded, *see* #68 at 21-22, a fact that plaintiff has not disputed, *see* #66 at 7. However, at most, the court takes judicial notice of the fact that its own search of the online Southern Middlesex recorded and registered land database, https://www.masslandrecords.com/MiddlesexSouth, using "Marta Escamilla," "Francisco Escamilla," and "205 Ferry Street" in Everett, "Unit 103," did not reveal that the discharge order was recorded. The court is not persuaded that the unsworn "fact" that the discharge order was not recorded is beyond "reasonable dispute." Fed. R. Evid. 201(b). Moreover, the court draws reasonable inferences in the light most favorable to plaintiff, not defendants. At any rate, for the reasons set out below, whether the discharge order was actually recorded or not is not dispositive at this preliminary stage.

the subject loan," *see* #30 ¶ 11; BMPC admits that "DONI hired BMPC to commence foreclosure

proceedings on the second mortgage," *see* #31 ¶ 11.

Around June 25, 2021, plaintiff received a letter from DONI setting out a payoff amount.

(#27 ¶ 29); *see* #43-4 (Ex. D) at 2 ($80,351.36). The letter included: a "**Balance as of today**"

($80,237.97); "**Wiring Information**" and an "**Overnight Mailing Address**" for DONI; and the

following "NOTE" under the signature line:

> This communication is from a debt collector. This firm is attempting to collect a
> debt, and any information obtained will be used for that purpose.

(#43-4 (Ex. D) at 2) (emphasis in original).[21]

Around October 18, 2021, plaintiff received another letter from DONI. (#27 ¶ 30); *see* #43-

6 (Ex. F) at 2. That letter included the following disclaimer, near the top of the page:

> **THIS LETTER IS FOR INFORMATIONAL PURPOSES ONLY. THIS
> LETTER IS NOT A DEMAND FOR PAYMENT OR A REQUEST FOR
> PAYMENT OF ANY FUNDS PREVIOUSLY DISCHARGED IN
> BANKRTUPCY OR SUBJECT TO AN AUTOMATIC STAY.**

(#43-6 (Ex. F) at 2.)

The October 18, 2021 letter read:

Dear Marta A. Escamilla,

This letter is for information purposes only. The sole purpose of this letter is to
advise you that Dyck-O'Neal, Inc. continues to hold a mortgage lien against the
referenced property.

*Your personal liability pertaining to the debt associated with the referenced
property may have been discharged in your Bankruptcy case. Nevertheless, Dyck-
O'Neal, Inc. still retains lien rights as to the property.*

You are not required to respond to this letter. However, we would appreciate hearing
from you as to your current intentions relating to the property, whether you wish to

---

[21] The June 25, 2021 letter is over the signature of a named "Account Manager" at "Ext. 2161."
*Id*.

retain ownership of the property, sell the property, or abandon your interest in the property.

We respectfully request you contact us at your earliest convenience. We may be reached by phone at 800-418-9401 if you would like to speak to us directly.

Hours of Operation: Monday-Thursday 8:00 am - 6:00 pm, Friday 8:00 am – 3 pm – Central Time

Respectfully,
Dyck-O'Neal, Inc.

*Bankruptcy Department*
*Ext. 2101*

*Id*. (emphasis added); *see also* #27 ¶ 31.

Under the signature line, the letter stated:

Amount owing of lien balance as of the date of this letter:          $80,712.11

Because of interest, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your check, in which event we will inform you before depositing the check for collection.

NOTE: This communication is from a debt collector. This firm is attempting to collect a debt and any information obtained will be used for that purpose.

*Id*.

Around April 1, 2022, plaintiff received a "[d]unning [l]etter" from BMPC, a law firm. *See* #27 ¶ 33; *see also* #43-7 (Ex. G) at 3. Plaintiff alleges that the dunning letter "indicat[ed]" that BMPC "was attempting to collect a debt on behalf of" DONI. (#27 ¶ 33.)[22] Page 1 of the dunning letter, toward the top, stated:

**Bendett & McHugh, P.C. is a debt collector**. We are trying to collect a debt that you owe Dyck-O'Neal, Inc. We will use any information you give us to help collect the debt.

---

[22] Plaintiff, in the FAC, alludes to some of the language from the dunning letter highlighted here, and claims that specified language is contradictory. (#27 ¶¶ 34-41.)

(#43-7 (Ex. G) at 2) (emphasis in original).

Near the middle of page 1, in the lefthand column, the dunning letter set out the amount "owed" as of November 1, 2008 ($41,427.52); interest through April 1, 2022 ($39,944.12); fees ($0.00); and credits ($0.00), and then stated: "**Total amount of the debt now: $81,371.64**." (#43-7 (Ex. G) at 2) (emphasis in original).

Near the middle of page 1, in the righthand column, the dunning letter advised that plaintiff could call or write BMPC by May 13, 2022 "**to dispute all or part of the debt**." *Id.* (emphasis in original). It further advised that if she did not call or write by then, BMPC would assume that its information was correct. *Id.* It advised that if she did write by then, BMPC "must stop collection of any amount [she] dispute[d] until [BMPC] sen[t] [her] information that show[ed] [she] owe[d] the debt." *Id.*

Page 1 of the dunning letter also advised that plaintiff could contact BMPC "if [she] wish[ed] to reinstate or payoff this loan on a date certain or to discuss other repayment options." *Id.*[23]

Page 2 of the dunning letter[24] stated:

> **NOTICE: This law firm is a debt collector and is attempting to collect a debt. Any information will be used for that purpose. Please note, however, that if you have previously received a discharge in bankruptcy which discharged this debt or the collection of the debt is prohibited by the automatic bankruptcy**

---

[23] Defense counsel proffer that the dunning letter, Exhibit G, "followed" the Model Validation Notice, Exhibit H, *see* #43 at 8, but this instruction differs from the parallel instruction in the model, which only states: "Contact us about your payment options." (#43-8 (Ex. H) at 2.)

There is also a discrepancy between the "How do you want to respond?" section in the dunning letter and the parallel section in the Model Validation Notice. The model includes an option for responding by enclosing an amount of money. *See* #43-8 (Ex. H) at 2. The dunning letter omits that option. *See* #43-7 (Ex. G) at 2.

[24] There is no Page 2 of the Model Validation Notice. *See* #43-8 (Ex. H).

> stay, this law firm is not attempting to collect a debt, but is only enforcing a lien against the subject property.
>
> **\*PLEASE ALSO NOTE: If you are not personally obligated to pay this debt but are a mortgagor due to your ownership interest in the subject real property, you are receiving this notice for informational purposes only and you are neither obligated to pay the debt nor entitled to dispute the same. If this describes you, this law firm is not attempting to collect a debt from you, but is only enforcing a lien against the subject property.**

*Id.* at 3.

Thereafter, the dunning letter stated, in relevant part:

> **The fact that you have thirty (30) days to indicate a dispute will not prevent us from filing suit or initiating/advancing foreclosure efforts in the manner prescribed by local law within that time prior to a timely, written dispute to the debt or any portion thereof or request for the name and address of the original creditor if different from the current creditor.**
>
> **If a suit is commenced during the thirty (30) day validation period, this notice does not affect your dealing with the court, and in particular it does not change the time by which you must answer the complaint, if one is filed….**

*Id.*

Plaintiff alleges that by sending the dunning letter, BMPC "is indicating that [BMPC is] attempting to enforce a lien against the [p]laintiff's property at 205 Ferry St. #103, Everett, MA 02149." (#27 ¶ 36.) BMPC admits that the letter "was sent to the [p]laintiff to enforce a lien against the property." (#31 ¶ 36.)

Around April 4, 2022, plaintiff received more letters from BMPC. *See* #27 ¶¶ 42-44; *see also* #43-9 (Ex. I)). One, titled "**RIGHT TO REQUEST A MODIFIED MORTAGE LOAN**," warned: "**If you do not return the enclosed Modification Options form and a completed loan modification application by May 4, 2022 your right to cure your mortgage default will end on July 3, 2022.**" (#43-9 (Ex. I) at 3-4) (emphasis in original); *see* #27 ¶ 44.

14

Another, titled "**90 DAY RIGHT TO CURE YOUR MORTGAGE DEFAULT**," stated that BMPC was contacting plaintiff because she did not make her monthly payments due December 1, 2008 to April 1, 2022; listed each of the months from December 2008 to April 2022; stated that she "must pay the past due amount of $69,869.17 on or before July 3, 2022;" and listed the past due amounts for each of the months from December 2008 to April 2022, over four-plus pages. (#43-9 (Ex. I) at 7-12); *see* #27 ¶ 43.

This "Right to Cure" letter advised plaintiff to contact the Homeownership Preservation Foundation to speak with counselors who might be able to help her work with her lender to avoid foreclosure, *see* #43-9 (Ex. I) at 12; *see also* #27 ¶ 52, and also stated:

> After July 3, 2022, you can still avoid foreclosure by paying the total past due amount before a foreclosure sale takes place. Depending on the terms of the loan, there may also be other ways to avoid foreclosure, such as selling your property, refinancing your loan, or voluntarily transferring ownership of the property to Dyck-O'Neal, Inc.

(#43-9 (Ex. I) at 13.) It then warned:

> **If you do not pay the total past due amount of $69,869.17 and any additional payments that may become due by July 3, 2022, you may be evicted from your home after a foreclosure sale. If Dyck-O'Neal, Inc. forecloses on this property, it means the mortgagee or a new buyer will take over the ownership of your home**.

*Id*. (emphasis in original); *see* #27 ¶ 43, 52.

The "Right to Cure" letter included the following "**NOTICE**" after the signature line, alone on a separate page:

> **THE LAW FIRM OF BENDETT & MCHUGH, P.C. IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. IF YOU HAVE PREVIOUSLY RECEIVED A DISCHARGE IN BANKRTUPCY WHICH DISCHARGED THIS DEBT, THIS CORRESPONDENCE IS NOT AND SHOULD NOT BE CONSTRUED TO BE AN ATTEMPT TO COLLECT A DEBT, BUT ONLY ENFORCEMENT OF A LIEN AGAINST PROPERTY.**

(#43-9 (Ex. I) at 14) (emphasis in original).

The record includes "Right to Request" and "Right to Cure" letters addressed to Francisco Escamilla. (#43-9 (Ex. I) at 16-39.)

V. <u>Discussion</u>.

The court first addresses Count II, discharge injunction, and then addresses Count I, FDCPA.

    A. <u>Count II: Discharge Injunction</u>.

        1. <u>The FAC and the parties' positions</u>.

Plaintiff claims that DONI and BMPC violated 11 U.S.C. § 524(a) by attempting to collect a debt and enforce a lien notwithstanding that the second mortgage was "stripped and discharged as an unsecured claim" and at the time of discharge, the loan and lien were "extinguished." (#27 ¶¶ 64-68.) Plaintiff seeks actual and punitive damages and attorney's fees and costs, as well as declaratory relief. *Id*. at 16.

The court questioned whether actual notice of the discharge order is necessary or if constructive notice suffices. (#60.) In their supplemental briefing, defendants argue that plaintiff must prove actual notice of both the discharge order and the treatment of the second mortgage loan, claiming that because it was not recorded in the appropriate Registry of Deeds, plaintiff is precluded from relying on constructive notice. Defendants also argue that the order itself does not reference the treatment of the loan. (#65 at 4-5.) Plaintiff argues that constructive notice suffices. (#64 at 4-6.)

The court also asked the parties to be prepared to address *Taggart v. Lorenzen*, 587 U.S. -- -, 139 S. Ct. 1795 (2019), at the April 2, 2024 hearing. (#60.) Defendants now argue "fair ground of doubt" as to the lawfulness of their conduct. (#65 at 6); *but see* #43 at 23-27; #50 at 8-10.

2. <u>The law</u>.

"At the conclusion of a bankruptcy proceeding, a bankruptcy court typically enters an order releasing the debtor from liability for most prebankruptcy debts. This order, known as a discharge order, bars creditors from attempting to collect any debt covered by the order." *Taggart*, 139 S. Ct. at 1799 (citing 11 U.S.C. § 524(a)(2)). Title 11 U.S.C. § 524(a)(2) states that a discharge order

> operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such [discharged] debt as a personal liability of the debtor, whether or not discharge of such debt is waived….

*Id*. This "discharge injunction" embodies the Bankruptcy Code's "fresh start" policy. *Best v. Nationstar Mortgage, LLC*, 540 B.R. 1, 8 (BAP 1st Cir. 2015) (per curiam) (citation omitted).

In the First Circuit, either a bankruptcy or a district court may invoke 11 U.S.C. § 105(a)[25] to enforce the discharge injunction and award actual and punitive damages and attorney's fees. *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 444-46 (1st Cir. 2000); *see U.S. Bank Trust, N.A., as Trustee for LSF11 Master Participation Trust v. Vincent*, #2:20-cv-00380-JAW, 2021 WL 3161547, at *3 (D. Me. July 26, 2021); *Lance v. PNC Bank, N.A.*, #15-cv-10250-FDS, 2015 WL

---

[25] Title 11 U.S.C. § 105(a) states:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

*Id*.

5437090, at *2 (D. Mass. Sept. 15, 2015).[26] These are akin to civil contempt sanctions. *Best*, 540 B.R. at 8.

The First Circuit has articulated a three-pronged test under 11 U.S.C. § 524(a)(2). To prove a violation of the discharge injunction, a debtor must prove that a creditor "(1) has notice of the debtor's discharge; (2) intends the actions which constitute the violation; and (3) acts in a way that improperly coerces or harasses the debtor." *Bates v. Citi Mortgage, Inc.*, 844 F.3d 300, 304 (1st Cir. 2016) (cleaned up) (quoting *Best*, 540 B.R. at 9) (quoting *Lumb v. Cimenian*, 401 B.R. 1, 6 (BAP 1st Cir. 2009))); *see Pratt v. Gen. Motors Acceptance Corp.*, 462 F.3d 14, 19 (1st Cir. 2006).

The four-pronged test governing civil contempt is whether (1) the alleged contemnor had notice that it was covered by the order; (2) the order was clear and unambiguous; (3) the contemnor had the ability to comply with the order; and (4) the order was in fact violated. *United States v. Saccoccia*, 433 F.3d 19, 27 (1st Cir. 2005).

On the third prong of the § 524(a)(2) test, a court determines whether conduct is improperly coercive or harassing under an objective standard considering the facts and circumstances of each case, including the immediateness of any threatened action and the context in which a statement was made. *Lumb*, 401 B.R. at 6-7; *see Bates*, 844 F.3d at 304. The debtor need not prove that the creditor acted in bad faith or that the creditor created all circumstances in which coercion allegedly occurred, only that the creditor's conduct had a coercive effect upon the debtor. *Lumb*, 401 B.R. at 7; *see Pratt*, 462 F.3d at 19 ("Although the fact that the Pratts (and not GMAC) initiated all the inquiries about releasing the lien might preclude a finding that GMAC 'harassed' the Pratts, that

---

[26] The First Circuit has declined to follow other courts that require litigants to bring discharge injunction claims in the bankruptcy court. *Bessett*, 230 F.3d at 445-446; *see Lance*, 2015 WL 5437090, at *2. The district court may, however, refer such claims to the bankruptcy court. *See*, *e.g.*, *U.S. Bank*, 2021 WL 3161547, at *3-4; *see* 28 U.S.C. § 157(a).

does not foreclose the possibility that GMAC's refusal was objectively and improperly 'coercive' in the circumstances.")

Further, the creditor's conduct may be improperly coercive even if the creditor was exercising legitimate state rights if the conduct infringed upon an important federal interest served by the discharge injunction. *Lumb*, 401 B.R. at 7 (quoting *Pratt*, 462 F.3d at 19 ("state law governs in a bankruptcy proceeding 'unless some federal interest requires a different result'" (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979))). The debtor need not prove an explicit threat; the objective standard "requires no such 'smoking gun.'" *Id.* (quoting *Pratt*, 462 F.3d at 19).

In *Taggart*, a Chapter 7 bankruptcy case, the Supreme Court adopted a "fair ground of doubt" standard under §§ 524(a)(2) and 105(a), pursuant to which a finding of civil contempt "may be appropriate when the creditor violates a discharge order based on an objectively unreasonable understanding of the discharge order or the statutes that govern its scope." 139 S. Ct. at 1802. That is,

> a court may hold a creditor in civil contempt for violation of a discharge order if there is *no fair ground of doubt* as to whether the order barred the creditor's conduct. In other words, civil contempt may be appropriate if there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful.

*Id.* at 1799 (emphasis in original).

In adopting the "no fair ground of doubt" standard, the Court reasoned that §§ 524(a)(2) and 105(a) "bring with them the 'old soil' that has long governed how courts enforce injunctions:"

> That old soil includes the potent weapon of civil contempt. … Under traditional principles of equity practice, courts have long imposed civil contempt sanctions to coerce the defendant into compliance with an injunction or compensate the complainant for losses stemming from the defendant's noncompliance with an injunction. …
>
> The bankruptcy statutes, however, do not grant courts unlimited authority to hold creditors in civil contempt. Instead, as part of the old soil they bring with them, the

bankruptcy statutes incorporate the traditional standards in equity practice for determining when a party may be held in civil contempt for violating an injunction.

In cases outside the bankruptcy context, we have said that civil contempt should not be resorted to where there is a *fair ground of doubt* as to the wrongfulness of the defendant's conduct.… This standard reflects the fact that civil contempt is a severe remedy…and that principles of basic fairness require that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt….

139 S. Ct. at 1801-02 (cleaned up) (citations omitted) (emphasis in original).

The Court explained that the "no fair ground of doubt" standard is "generally an *objective* one;" the defendant's subjective belief that it was complying with an order ordinarily will not insulate it from civil contempt if that belief was objectively unreasonable. *Id*. at 1802 (emphasis in original). "The absence of wilfulness does not relieve from civil contempt." *Id*. (cleaned up) (citation omitted). Yet subjective intent is not "always irrelevant." *Id*. On the one hand, a finding of civil contempt may be appropriate where the defendant acted in bad faith; on the other, the defendant's good faith may be relevant to the determination of the appropriate sanction. *Id*.

The Court rejected the standard applied by the Ninth Circuit, i.e., that a creditor's good faith belief that the discharge order does not apply to its claim precludes a finding of contempt even if that belief is unreasonable:

…[T]his standard is inconsistent with traditional civil contempt principles, under which parties cannot be insulated from a finding of civil contempt based on their subjective good faith. It also relies too heavily on difficult-to-prove states of mind. And it may too often lead creditors who stand on shaky legal ground to collect discharged debts, forcing debtors back into litigation (with its accompanying costs) to protect the discharge that it was the very purpose of the bankruptcy proceeding to provide.

*Id*. at 1802-03.

The Court also rejected the standard applied by the bankruptcy court and proposed by the plaintiff, i.e., that a finding of civil contempt is appropriate if the creditor was aware of the discharge order and intended the actions that violated it. *Id*. at 1799, 1803. The Court reasoned:

> Because most creditors are aware of discharge orders and intend the actions they take to collect a debt, this standard would operate much like a strict-liability standard. It would authorize civil contempt sanctions for a violation of a discharge order regardless of the creditor's subjective beliefs about the scope of the discharge order, and regardless of whether there was a reasonable basis for concluding that the creditor's conduct did not violate the order.

*Id*. at 1803.

> The Court was not persuaded by the plaintiff's reliance on automatic stay authority:

> An automatic stay is entered at the outset of a bankruptcy proceeding. The statutory provision that addresses the remedies for violations of automatic stays says that "an individual injured by any willful violation" of an automatic stay "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1). This language, however, differs from the more general language in section 105(a). ... The purposes of automatic stays and discharge orders also differ: A stay aims to prevent damaging disruptions to the administration of a bankruptcy case in the short run, whereas a discharge is entered at the end of the case and seeks to bind creditors over a much longer period.

*Id*. at 1803-1804. The Court expressly did not decide whether the word "willful," as it appears in § 362(k)(1), supports a standard like a strict-liability standard. *Taggart*, 139 S. Ct. at 1804.

Courts have applied this "no fair ground of doubt" standard outside of the Chapter 7 context, as well as to bankruptcy orders other than discharge orders, through § 105(a). *See Beckhart v. NewRez LLC*, 31 F.4th 274, 275, 277 (4th Cir. 2022) (Chapter 11); *In re Pope*, 647 B.R. 597, 604, 624 (Bankr. D.N.H. 2022) (order confirming Chapter 13 plan).

The First Circuit has not addressed §§ 524(a)(2) and 105(a) since *Taggart*. Few courts have addressed, post-*Taggart*, whether constructive notice of a discharge order is enough. Notice is not often in dispute. *See In re Lett*, #10-61451-BEM, 2023 WL 2246714, at *6 (Bankr. N.D. Ga. Feb.

27, 2023) (as in *Taggart*, notice is typically implicit); *see*, *e.g.*, *Pope*, 647 B.R. at 625 ("The parties do not dispute that [creditor] had notice of the Plan and Confirmation Order…"). Pre-*Taggert*, there was a split of appellate authority as to whether actual notice of an order is necessary for a finding of civil contempt generally, or whether constructive notice suffices. *See In re Lett*, 2023 WL 2246714, at \*6-7 (collecting authorities); *contrast*, *e.g.*, *Cypress Barn, Inc. v. Western Elec. Co., Inc.*, 812 F.2d 1363, 1364 (11th Cir. 1987) (actual notice) (citing Fed. R. Civ. P. 65)[27] *with*, *e.g.*, *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (constructive notice).

Post-*Taggart*, the Fourth Circuit could not conclude that the bankruptcy court applied the correct legal standard in finding a creditor in civil contempt where the decision did not mention *Taggart* or its "no fair ground of doubt" standard and instead applied the test articulated in *Ashcraft*, 218 F.3d at 301, a pre-*Taggart*, non-bankruptcy case. *Beckhart*, 31 F.4th at 278; *but see De Simone v. VSL Pharm., Inc.*, 36 F.4th 518, 529 (4th Cir. 2022); *see Lett*, 2023 WL 2246714, at \*6-7 ("possible" that actual notice of discharge order is necessary but ultimately declining to decide as plaintiff failed to prove at trial either actual or constructive notice).[28]

---

[27] Fed. R. Civ. P. 65(d)(2) provides that an injunction "binds only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)."

[28] Before *Taggart*, bankruptcy judges in this circuit had suggested that constructive notice of the "discharged debt" was enough. *See In re Zine*, 521 B.R. 31, 39 & n. 53 (Bankr. D. Mass. 2014) (citing *In re Nassoko*, 405 B.R. 515, 522 (Bankr. S.D.N.Y. 2009) (citing *In re Torres*, 367 B.R. 478, 490 (S.D.N.Y. 2007))); *In re Laboy*, #93-bk-00753, #09-ap-00047, 2010 WL 427780, at \*6 (Bank. D. P.R. Feb. 2, 2010) (citing *In re Torres*, 367 B.R. at 490). After *Taggart*, one bankruptcy judge in this circuit has suggested the same, but in a case in which the parties agreed that the defendant had actual notice, and without discussing *Taggart*. *In re Padilla*, #15-bk-06907 (ESL), #21-ap-00110, 2023 WL 2504706, at \*11-12 (Bankr. D. P.R. Mar. 14, 2023). In *Pagan v. Planet Home Lending, LLC*, #22-cv-10447 (MAJ), 2024 WL 3046637 (D. P.R. June 18, 2024), "[t]here [was] no dispute that Defendant had knowledge of the discharge injunction." *Id.* at \*5.

Post-*Taggart*, the Bankruptcy Appellate Panel for the Ninth Circuit disagreed that the Supreme Court in *Taggart* addressed a notice requirement and held, in relevant part, that the bankruptcy court did not abuse its discretion in declining to award damages for violation of the discharge injunction, where the Chapter 13 debtors had not proven by clear and convincing evidence when the creditor, which held the second mortgage lien on their residence, became aware of the discharge order. *In re Moon*, #NV-20-1057-BGTa, #NV-20-1070-BGTa, 2021 WL 62629, *1, 10-11 (BAP 9th Cir. Jan. 7, 2021) (unpublished).[29] The evidence showed that the discharge order was sent to the creditor but at an incorrect address due to an error in the creditor matrix. While a debtor credibly testified about a call during which he told the creditor's representative about the discharge, he could not remember when the call occurred, and no other evidence of the call was introduced. The bankruptcy court reasoned that absent sufficient proof of when the creditor became aware of the discharge order, there was a "fair ground of doubt" as to the lawfulness of its conduct. *In re Moon*, 613 B.R. 317, 351-352 & n.59 (Bankr. D. Nev. 2020).

3. Analysis.

a. Coercion.

The court rejects defendants' argument that there are insufficient facts in the record from which plausibly to infer coercion. *Bates*, on which defendants primarily rely, *see* #43 at 26; *see also* #50 at 11, is not comparable. The forms there, sent after the creditor had already foreclosed on the home and the debtors had moved out, conveyed the possibility of income or loss reportable for tax purposes because of the foreclosure. 844 F.3d at 302, 304-305. In this case, some letters conveyed the possibility of foreclosure, as well as eviction, *see* #43-6 (Ex. F) at 2; #43-7 (Ex. G)

---

[29] The second mortgage lien had been stripped off in the debtors' bankruptcy case. *Id*. at *2.

at 3; #43-9 (Ex. I) at 3, 12-14, which are objectively more coercive consequences than the possibility of reportable income or loss.

Furthermore, *Bates* was in the context of summary judgment. 844 F.3d. at 303. Although in *Best*, *see* #43 at 26; *see also* #50 at 11, the First Circuit Bankruptcy Appellate Panel affirmed the grant of a motion for judgment on the pleadings, *see* 540 B.R. at 7, defendants overlook that "despite the Debtor's protestations to the contrary, the pleadings, as supplemented by the facts susceptible to judicial notice, [did] not reveal a potential dispute about this material fact; rather, they establish[ed] that Nationstar was a secured creditor with a lien on the Property," *see id*. at 12. Here, defendants assume, for now, that the second mortgage lien was stripped off in plaintiff's bankruptcy case.

Similarly, defendants cite so much of *Bates* that cites *Jamo v. Katahdin Fed. Credit Union*, 283 F.3d 392, 402 (1st Cir. 2002), for the proposition that

> references to potential foreclosure in letters to a debtor during bankruptcy proceedings were not coercive where the letters accurately reported that the debtor could face foreclosure after bankruptcy but threatened no "immediate action" against the debtors.

844 F.3d at 304 (citation omitted); *see* #43 at 26. Plaintiff's point is that defendants did not "accurately" report that she could face foreclosure.

Objectively and improperly coercive circumstances may be plausibly inferred from the letters that defendants submitted and which, everyone agrees, are incorporated into the pleadings. One example of these coercive communications is the letter of October 18, 2021, in which DONI insisted that it "still retain[ed] lien rights" and asked plaintiff to specify whether she "wish[ed] to retain ownership of the property, sell the property, or abandon [her] interest in the property." (#43-6 (Ex. F) at 2.) Another example is the dunning letter BMPC sent plaintiff on April 1, 2022, claiming she owed over $81,000 in alleged "debt," and that "[i]f" the debt had been discharged,

then it was simply enforcing a lien. (#43-7 (Ex. G) 2-3) (emphasis omitted).  Finally, three days

later, BMPC sent plaintiff (and Francisco Escamilla) the "Right to Cure" letter claiming that she

could be "evicted" after "a foreclosure sale" if she did not pay the "total past due amount" of nearly

$70,000, if not by July 3, 2022, then at least before the sale. (#43-9 (Ex. I) at 13) (emphasis

omitted).

### b. Notice; no fair ground of doubt.

Assuming without deciding that actual notice is necessary,[30] there are sufficient facts in the

record from which one may plausibly infer that defendants had actual notice of the discharge

order.[31] On April 27, 2021, DONI invited plaintiff to call its "bankruptcy specialist" at "ext. 2101"

if the second mortgage loan was subject to the automatic stay or had been discharged. (#43-3 (Ex.

C) at 2.) Further, DONI's October 18, 2021 letter was signed by its "Bankruptcy Department" at

"Ext. 2101." (#43-6 (Ex. F) at 2.) Defense counsel proffer no explanation. *See* #43 at 5.

Regardless of how it came to be that, inferentially, DONI's "Bankruptcy Department" at

"Ext. 2101" sent plaintiff this letter, it is at least plausible that the department had relevant

information. In arguing that they lacked notice of the discharge order, defendants do not address

the content of this letter, which preceded BMPC's April 1, 2022 dunning letter and its April 4,

---

[30] Actual notice may well be necessary, but the court is wary of reliance, post-*Taggart*, *see* #43 at 24; #50 at 9; #64 at 4; #65 at 4, on *Fleet Mortgage Group, Inc. v. Kaneb*, 196 F.3d 265 (1st Cir. 1999), an automatic stay case. *See Taggart*, 139 S. Ct. at 1803-1804 (noting divergent statutory language and purposes). The other authorities cited by the parties and those found by the court are not sufficiently conclusive at this stage of the case.

[31] The court remarked at the April 2, 2024 hearing that plaintiff had not adequately pled actual notice. (#68 at 19.) The finding here is made after further reflection, based not only on the FAC, but on the "relevant entirety," *see Clorox*, 228 F.3d at 32, of the letters that defendants properly have made part of the record.

2022 "Right to Request" and "Right to Cure" letters. *See* #43 at 25; *see also* #50 at 9. The department wrote, in part:

> Your personal liability pertaining to the debt associated with the referenced property may have been discharged in your Bankruptcy case.

(#43-6 (Ex. F) at 2.) Reference to "your Bankruptcy case" supports a reasonable inference of actual notice of plaintiff's bankruptcy case, while reference to the possibility of the "discharge[]" of plaintiff's personal liability supports a reasonable inference of actual notice of the order.[32]

These reasonable inferences are supported by the well-pled allegations that plaintiff listed Carrington as a creditor on the creditor matrix, *see* #27 ¶ 13, and certificates of service indicated that the amended plan and post-confirmation plan, *see id.* ¶¶ 16, 21, were served on Carrington,[33] and the further reasonable inference that DONI received Carrington's paperwork when "ownership and servicing," *see* #43-3 (Ex. C) at 2, of the second mortgage loan was transferred.

On the lack of notice argument, defendants' briefing does not differentiate DONI from BMPC, only defendants from Carrington. *See* #43 at 24-25; #50 at 8-9; *see also* #65 at 3-7. It

---

[32] Defendants do not adequately develop a lack of notice or fair ground of doubt argument from the next sentence: "Nevertheless, Dyck-O'Neal, Inc. still retains lien rights as to the property." *Id.*

[33] Plaintiff requests leave to further amend on actual or constructive notice, pointing to the Chapter 13 trustee's final report and account, which includes an entry for a $149.19 payment to Carrington. (#64 at 6) (citing #10-bk-12071, #60). The court, however, can take judicial notice of the existence of this entry, though not of its truth. It can also take judicial notice that during the bankruptcy case, U.S. Bank moved for relief from the automatic stay. #10-bk-12071, #48. U.S. Bank's memorandum stated the amount owed on the first mortgage ($189,773.95) and the second ($45,000), as well as the fair market value of the property ($145,000). It also included a certificate of service indicating service on Carrington. #10-bk-12071, #49 at 2-3, 6. U.S. Bank and plaintiff entered into a stipulation, which the bankruptcy court approved. #10-bk-12071, #58. The stipulation and U.S. Bank's motion for approval included certificates of service indicating service on Carrington. #10-bk-12071, #54 at 3, #55 at 2.

suffices to say that it is reasonable to infer that when DONI hired BMPC to foreclose, *see* #31 ¶ 11; *see also* #30 ¶ 11, DONI passed relevant information along to BMPC.[34]

That leaves defendants' argument that they lacked notice or there is a fair ground of doubt as to the lawfulness of their conduct because (1) the discharge order itself does not reference the treatment of the second mortgage loan and a lien generally survives bankruptcy proceedings and (2) plaintiff allegedly failed to record the discharge order. *See* #65 at 5, 6.[35] As noted, the court only takes judicial notice of the fact that its own online search did not reveal that the discharge order was recorded. Defendants do not suggest, and the authorities they cite do not support the conclusion,[36] that a creditor cannot obtain actual notice of a discharge order through alternative

---

[34] Although unnecessary to its finding, the court also notes the omission from BMPC's April 1, 2022 dunning letter of the option in the Model Validation Notice to respond by paying an amount of money. *Contrast* #43-7 (Ex. G) at 2 *with* #43-8 (Ex. H) at 2.

[35] Defendants suggest that it would be their burden to prove that there is a fair ground of doubt. (#65 at 6); *see In re Venuto*, 629 B.R. 331, 340 (Bankr. D. Mass. 2021) ("…a creditor may defeat a finding of contempt for violating the discharge injunction by establishing…."); *see also Taggart*, 139 S. Ct. at 1802 ("…a party's 'record of continuing and persistent violations' and 'persistent contumacy' justified placing 'the burden of any uncertainty in the decree…on [the] shoulders' of the party who violated the court order") (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192-193 (1949); *see also In re Kimball Hill, Inc.*, 620 B.R. 894, 905 (Bankr. N.D. Ill. 2020) (imposing burden on debtor to set forth facts that warrant relief and burden on creditor to prove uncertainty of order); *but see In re DiBattista*, 615 B.R. 31, 39 (Bankr. S.D.N.Y 2020) (questioning whether *Torres*, 367 B.R. at 490, remains good law and noting: "it is not entirely clear which party carries the burden on a motion for contempt, though it is likely still on the movant"). The court makes no final determination of the allocation of the burden of proof.

The court also recognizes that plaintiff requests declaratory relief, not merely civil contempt sanctions. (#27 at 16.)

[36] *Bank of Am., N.A. v. Casey*, 52 N.E.3d 1030 (Mass. 2016), *see* #65 at 5, provides that under Mass. Gen. Laws ch. 183, § 4, a mortgage must be recorded in the appropriate Registry of Deeds to provide effective notice "*beyond* the parties to the mortgage transaction and *those with actual notice of it*." *Id*. at 1035 (emphasis supplied) (citing *Tramontozzi v. D'Amicis*, 183 N.E.2d 295, 297 (Mass. 1962) ("…an unrecorded mortgage is invalid as against third parties *who do not have 'actual notice' of it*") (emphasis supplied)).

means, such as personal service or a phone call from a debtor. *See* Fed. R. Civ. P. 65(d)(2) ("by personal service or otherwise").

Defendants do not address the abundant authority in this circuit and the majority of circuits that, in Chapter 13 bankruptcy cases, a debtor has the ability to "strip off" a mortgage lien that is found to have no value because the amount of a senior mortgage lien and encumbrances exceed the value of the residence. *See In re Guerra*, 2017 WL 1190604, at *2-3 & nn.5-6 (collecting post-*Nobleman v. Am. Savings Bank*, 508 U.S. 324 (1993) caselaw from First, Second, Third, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits and joining majority of courts in concluding that Supreme Court's decision in *Bank of Am., N.A. v. Caulkett*, 575 U.S. 790 (2015), did not impact *Nobleman* line); *see also In re Mann*, 249 B.R. at 840 ("We agree with the Third and Fifth Circuit Courts of Appeals and the Ninth Circuit Bankruptcy Appellate Panel, and the several bankruptcy and district courts making up the majority view. Pursuant to [11 U.S.C.] § 506(a) and § 1322(b)(2), and notwithstanding the antimodification provision in the latter, Chapter 13 plans may avoid residential real property liens that are wholly unsecured"). The court will not draw an inference against plaintiff that defendants were unaware of this authority or that it is objectively reasonable for a creditor to ignore, or to fail adequately to account for, the possibility of "strip off" in light of this authority.

Defendants have not cited authority to support the conclusion that a Chapter 13 discharge order typically would refer to the treatment of a second mortgage loan or that an objectively reasonable creditor does not refer to the plan.[37] *Cf. In re Monahan*, 497 B.R. 642, 651-652 (BAP

---

[37] The discharge order here, the 2013 revision of Form B18W, stated, in part, that plaintiff was granted a discharge "pursuant to 11 U.S.C. § 1328(a)," *see* #43-2 (Ex. B) at 2, and the statute states, in part, that "the court shall grant the debtor a discharge of all debts provided for *by the plan*…," *see* 11 U.S.C. § 1328(a) (emphasis supplied).

1st Cir. 2013) (reversing bankruptcy court's finding that Internal Revenue Service violated injunction given lack of notice from Chapter 13 plan that it would provide for discharge of priority tax claim upon completion) (applying *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) ("[d]ue process requires notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections") (cleaned up) (citation omitted)). The *Taggart* Court recognized that Chapter 7 discharge orders typically are written in general terms and stated that civil contempt sanctions may also be appropriate where a creditor has an objectively unreasonable understanding of the governing statutes, *see id*. at 1799-1800, 1802. Regardless, it is not appropriate for the court to evaluate objective reasonableness on so limited a record. *See*, *e.g.*, *In re Carnegie*, 621 B.R. 392, 411 (Bankr. M.D. N.C. 2020) (declining to consider defendant's argument, on Rule 12(b)(6) motion, that fair ground of doubt existed because Chapter 13 discharge order did "not indicate that a secured debt has been satisfied or otherwise terminated").

    B. Count I: FDCPA.

        1. The FAC and the parties' positions.

Plaintiff alleges that DONI and BMPC are "debt collector[s]" as defined by 15 U.S.C. § 1692a(6) and that the purpose of their "business in this case is the collection of a defaulted consumer mortgage debt that was previously discharged in bankruptcy." (#27 ¶¶ 6-7.) She claims that BMPC violated § 1692g with its April 1, 2022 dunning letter, which plaintiff alleges is confusing and makes contradictory statements. (#27 ¶¶ 49, 55-59.)

Plaintiff also claims that DONI and BMPC violated § 1692f. In the FAC, plaintiff cites § 1692f(1), *see* #27 ¶ 48, but not § 1692f(6). DONI purportedly violated § 1692f by attempting to collect an "alleged debt" and by attempting to enforce an "alleged lien" that is "not valid" because

of the bankruptcy discharge. (#27 ¶¶ 50-51.) BMPC purportedly violated § 1692f with its April 4, 2022 "Right to Cure" and "Right to Request" letters, *see* #27 ¶¶ 52-53, and by attempting to enforce an "alleged lien" that is "not valid" because of the bankruptcy discharge, *see id.* ¶ 54.

Before the October 26, 2023 hearing on the second motion to amend, the court asked the parties to be prepared to address *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. ---, 139 S. Ct. 1029 (2019), interpreting the FDCPA's so-called "limited purpose" definition of "debt collector." (#33.) At that hearing, the parties argued regarding *Obduskey*, *see* #66 at 7-16; as noted, the second motion to amend was denied without prejudice. In their Rule 12(c) briefing, defendants argue that they fall under the limited purpose definition and are therefore only subject to § 1692f(6), and that plaintiff has not asserted a § 1692f(6) claim. (#43 at 13-23); *see* #50 at 7-8.

At the April 2, 2024 hearing, plaintiff's counsel conceded that plaintiff has not asserted a § 1692f(6) claim, and that she would need further leave to amend. (#68 at 7.) It is plaintiff's position, however, that defendants do not fall under the limited purpose definition. *Id.*; *see* #46 at 17-21.

Defendants also argue that under § 1692a(5), "debt" requires the existence of an obligation to pay money and there was none here because of the discharge order. (#43 at 11-13, 23); *see* #50 at 2-5. Defendants argue that "dictum" in *Arruda* – that a plaintiff may bring a FDCPA claim based on the "false[]" allegation of an obligation to pay money, *see* 310 F.3d at 23 – does not apply. According to defendants, plaintiff failed adequately to plead the "false" debt allegation theory. (#43 at 12-13.) Finally, defendants argue that the hypothetical unsophisticated consumer would have understood from discharge disclaimers that the letters were not demands to pay money. *Id.* at 13.

        2.    <u>The law</u>.

                a. <u>Title 15 U.S.C. §§ 1692g and 1692f</u>.

Congress enacted the FDCPA to "eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). 15 U.S.C. § 1692g(a) requires a "debt collector" to disclose the consumer's right within thirty days to dispute a debt and under § 1692g(b), any collection activities within that thirty-day period "may not overshadow or be inconsistent with [that] disclosure…" 15 U.S.C. § 1692g(a)-(b).

Title 15 U.S.C. § 1692f states, in part:

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.
…

(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if—

    (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

    (B) there is no present intention to take possession of the property; or

    (C) the property is exempt by law from such dispossession or disablement.
…

*Id*.

    b. "<u>Debt collector</u>."

The so-called "primary" definition of "debt collector" is found in the first sentence of 15 U.S.C. § 1692a(6):

…any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

*Id.*; *see Obduskey*, 139 S. Ct. at 1035-1036.[38]

The "limited purpose" definition is found in the third sentence of 15 U.S.C. § 1692a(6):

> For the purpose of section 1692f(6) of this title, [the] term [debt collector] also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.

*Id.*; *see Obduskey*, 139 S. Ct. at 1036.

In *Obduskey*, the Supreme Court "concede[d] that if the FDCPA contained *only* the primary definition, a business engaged in nonjudicial foreclosure would qualify as a debt collector for all purposes," 139 S. Ct. at 1036 (emphasis in original), adding:

> …[A] home loan is an obligation to pay money, and the purpose of a mortgage is to secure that obligation…. Foreclosure, in turn, is the process in which property securing a mortgage is sold to pay off the loan balance due…. In other words, foreclosure is a means of collecting a debt. And a business pursuing nonjudicial foreclosures would, under the capacious language of the Act's primary definition, be one that "regularly collects or attempts to collect, directly or indirectly, debts."

*Id.* at 1036 (cleaned up) (citations omitted).

The Court reasoned from the statutory language and legislative history that debt-collector related prohibitions of the FDPCA, with the exception of § 1692f(6), do not apply to those who are engaged in no more than security-interest enforcement. 139 S. Ct. at 1037.  The Court assumed

---

[38] The primary definition itself includes two definitions: "principal purpose" and "regularly conducts." *Reygadas v. DNF Assocs., LLC*, 982 F.3d 1119, 1123 (8th Cir. 2020). The Supreme Court in *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79 (2017), interpreted the regularly conducts definition, noting that it focuses attention on third party collection agents working for debt owners, not on debt owners themselves, and rejecting the argument that debt buyers are "debt collectors" when they regularly purchase and collect defaulted debts. *Id.* at 82-83, 87-88; *cf. Reygadas*, 982 F.3d at 1123-1124 (considering debt buyers under principal purpose definition). Neither party here has developed any argument under the principal purpose and regularly conducts definitions.

that the notices sent by the defendant-law firm "were antecedent steps required under state law to enforce a security interest." *Id*. at 1039. It continued:

> [B]ecause he who wills the ends must will the necessary means, we think the Act's (partial) exclusions of "the enforcement of security interests" must also exclude the legal means required to do so. This is not to suggest that pursuing nonjudicial foreclosure is a license to engage in abusive debt collection practices like repetitive nighttime phone calls; enforcing a security interest does not grant an actor blanket immunity from the Act. But given that we here confront only steps required by state law, we need not consider what *other* conduct (related to, but not required for, enforcement of a security interest) might transform a security-interest enforcer into a debt collector subject to the main coverage of the Act.

*Id*. at 1039-1040 (emphasis in original).[39]

Justice Sotomayor, concurring, remarked that the Court "rightly cabin[ed]…its holding to the kinds of good-faith actions presented here," explaining:

> …[I]n addition to the unnecessary and abusive practices that the Court notes, I would see as a different case one in which the defendant went around frightening homeowners with the threat of foreclosure without showing any meaningful intention of ever actually following through. There would be a question, in such a case, whether such an entity was in fact a "business the principal purpose of which is the enforcement of security interests,"…or whether it was simply using that label as a stalking horse for something else.

*Id*. at 1041 (quoting 15 U.S.C. § 1692a(6)).

After *Obduskey*, district courts here and elsewhere have emphasized the importance to the Supreme Court's decision of the assumption that the notices at issue "were antecedent steps required under state law to enforce a security interest," 139 S. Ct. at 1039. *See Reppy v. Cenlar FSB, Inc*., #5:23-cv-5227, 2024 WL 947473, at *3 (W.D. Ark., Mar. 5, 2024); *Britton v. Marcus, Errico, Emmer & Brooks, P.C.*, #1:18-cv-11288-IT, 2022 WL 2308934, at *7 (D. Mass. June 27,

---

[39] In rejecting the plaintiff's argument that § 1692f(6) "fits more comfortably with repossession of personal property than nonjudicial foreclosure," the Court suggested that it was "at least plausible that 'threatening' to foreclose on a consumer's home without having legal entitlement to do so is the kind of 'nonjudicial action' without 'present right to possession' prohibited by that section," but expressly did not decide "precisely what conduct runs afoul of § 1692f(6)." 139 S. Ct. at 1038.

2022), *reconsideration denied*, 2023 WL 4373890 (D. Mass. July 6, 2023), *motion to alter or amend judgment denied*, 2023 WL 7091040 (D. Mass. Oct. 26, 2023); *Brown v. Shapiro & Kreisman LLC*, #H-19-4220, 2021 WL 2763854, *3 (S.D. Tex. Apr. 27, 2021); *Gagnon v. Hal P. Gazaway and Assocs*., LLC, #3:19-cv-178 JWS, 2019 WL 4539926, at *2 (D. Ala. Sept. 19, 2019); *Cooke v. Carrington Mortgage Srvcs*., #TDC-18-0205, 2019 WL 3241128, at *2 (D. Md. July 18, 2019); *Sevela v. Kozeny & McCubbin, L.C*., #8:18-cv-390, 2019 WL 2066924, at *5 (D. Neb. May 2, 2019). In *Moody v. PennyMac Loan Srvcs., LLC*, #16-cv-00021-JL, 2019 WL 7596261 (D. N.H. Nov. 12, 2019), Judge Laplante "decline[d] to find as a matter of law or undisputed fact" that the defendant-mortgage loan owner and servicer fell within the limited purpose definition of "debt collector" where the defendant "point[ed] to no legal authority or record evidence" that the deficiency notice, "sent more than six months after" the nonjudicial foreclosure on plaintiff's home, was a "necessary step" in that proceeding let alone required under New Hampshire law. *Id*. at *8; *accord Hullett v. Plunkett Clooney, P.C*., #1:18-cv-1441, 2020 WL 2176880, at *5 (W.D. Mich. Mar. 16, 2020) (denying motion for judgment on pleadings; "by the time Defendants [law firm and lawyer] sent the Second Letter, the sheriff's sale was complete…").

The First Circuit has not yet addressed *Obduskey*.[40] Other Courts of Appeals have acknowledged that a plaintiff may allege "*other* conduct" that transforms a security-interest enforcer to a debt collector, *see* 139 S. Ct. at 1039-1040. *See Barnes v. Routh Crabtree Olsen, PC*, 963 F.3d 993, 999 (9th Cir. 2020) (primary definition "kicks in only once a person does something in addition to the actions required to enforce a security interest") (cleaned up; emphasis omitted) (citation omitted); *see also Bates v. Green Farms Condo. Assoc.*, 958 F.3d 470, 481-483 (6th Cir. 2020) (complaint included no general allegations regarding defendants' regular business activities

---

[40] Appeal in *Britton* is pending, No. 23-1998.  The appellants' brief is due August 2, 2024.

and assuming without deciding that allegations about specific conduct could ever establish regular business activities, only well-pled allegation was "antecedent step[] required under state law").

The court has found no guidance in the post-*Obduskey* cases for the circumstances presented here, that is, where defendants claim to fall under the limited purpose definition of "debt collectors" yet, for present purposes, do not dispute that the second mortgage lien was stripped off in plaintiff's bankruptcy case.[41] In a case unlike this one in which the plaintiff only asserted a § 1692f(6) claim, *see Thompson v. Fire Bros. Mortgage Co. Srvcs. and Securing, Inc.*, 800 Fed. Appx. 369, 371 n.1 (6th Cir. 2020) (unpublished), the Sixth Circuit affirmed the grant of a motion for summary judgment because the defendant-property preservation and maintenance company did not fall within the limited purpose definition. By the time the defendant secured the allegedly vacant property and removed the plaintiff's belongings, the home had been foreclosed on and the property had been purchased at the sheriff's sale, after which the plaintiff failed to timely redeem. The defendant "was not acting to enforce a security interest because no security interest existed" then. *Id*. at 371-373.

        c. "<u>Debt</u>."

Title 15 U.S.C. § 1692a(5) defines "debt" as

> any obligation or alleged obligation of a consumer to pay money arising out of a
> transaction in which the money, property, insurance, or services which are the

---

[41] Three days after the April 2, 2024 hearing, the Eleventh Circuit affirmed the grant of a motion to dismiss where the plaintiff did not adequately plead that the defendant-law firm was a "debt collector" under the primary definition despite the plaintiff's claim that trust allegedly holding the security deed that the defendant represented in the nonjudicial foreclosure did not lawfully hold the deed. However, the claim that the trust did not lawfully hold the deed was not supported by the record; the trust in fact "held the security deed and was authorized to foreclose" under state law. *Maddox v. Aldridge Pite LLP*, #23-12853, 2024 WL 1475463, at *2-3 (4th Cir. Apr. 5, 2024) (per curiam) (unpublished); *see Maddox v. Aldridge Pite, LLP*, #1:23-cv-00389-ELR-JCF, 2023 WL 5821723 (N.D. Ga. July 28, 2023), *adopting report and recommendation*, 2023 WL 4049313 (N.D. Ga. May 30, 2023).

subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

*Id*.

In *Arruda*, the First Circuit stated that "the sine qua non of a debt is the existence of an obligation (actual or alleged)." 310 F.3d at 23. Several district courts have relied on this statement in dismissing FDCPA claims by plaintiffs who have had their personal obligations to pay mortgage loans discharged in bankruptcy. *See Harrer v. Bayview Loan Servicing, LLC*, #15 C 4075, 2015 WL 6995559, at *1 (N.D. Ill. Nov. 30, 2016) (collecting cases, including *Shaw v. Bank of Am., NA*, #10-cv-11021-DJC, 2015 WL 224666, at *6 (D. Mass. Jan. 15, 2015)).

The *Arruda* court also recognized that "a plaintiff may bring a claim under the FDCPA by pleading that a debt collector falsely alleged an obligation to pay money." 310 F.3d at 23. This statement has been regarded as a "qualification" on the requirement of the "existence" of an obligation and consistent with the law in other circuits that "'the FDCPA is designed to protect consumers from the unscrupulous antics of debt collectors, irrespective of whether a valid debt actually exists.'" *Harrer*, 2016 WL 6995559, at *2 (quoting *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (citing *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 341 (7th Cir. 1997) (citing *Baker v. G.C. Servs. Corp.*, 677 F.2d 775, 777 (9th Cir. 1982)))); *see Bauman v. Bank of Am., N.A.*, 808 F.3d 1097, 1102 (6th Cir. 2015) ("A FDCPA claim, however, does not focus on the validity of the debt, but instead on the use of unfair methods to collect it") (cleaned up) (citing, *inter alia*, *Baker*). "That is because bringing or even threatening to bring a lawsuit which the debt collector knows or should know is unavailable or unwinnable by reason of a legal bar such as the statute of limitations is the kind of abusive practice the FDCPA was intended to eliminate." *Harrer*, 2016 WL 6995559, at *2 (cleaned up) (citation omitted).

*Arruda* involved the discharge of debts from purchases of household goods in Chapter 7 bankruptcy cases, *see* 310 F.3d at 16, and subsequent attempts by the creditor, Sears, to enforce liens through letters and other communications giving the debtors the option of surrendering the goods or redeeming them by paying their fair market value, *see id*. at 17-18. Sears had valid liens: "Of course, the discharges did not erase Sears's prepetition security interest in the purchased property." *Id*. at 17.

### d. The hypothetical unsophisticated consumer standard.

In determining whether a letter violates 15 U.S.C. § 1692g(b), the letter is to be viewed from the perspective of "the hypothetical unsophisticated consumer," a standard which "protects all consumers, including the inexperienced, the untrained and the credulous." *Pollard v. Law Office of Mandy L. Spaulding*, 766 F.3d 98, 103 (1st Cir. 2014) (cleaned up) (citations omitted). The standard is objective and preserves an element of reasonableness; "[a] debt collector will not be held liable based on an individual consumer's chimerical or farfetched reading of a collection letter." *Id*. (cleaned up) (citation omitted).

Whether a letter violates § 1692f's prohibition on the use of "unfair or unconscionable" means to collect or attempt to collect any debt is also evaluated under this objective standard. *Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 997-998 (7th Cir. 2003); *Lannan v. Levy & White*, 186 F. Supp. 3d 77, 91 (D. Mass. 2016).

### 3.     Analysis.

The court is not persuaded at this preliminary stage that defendants fall under the limited purpose definition of "debt collector." It views this case as potentially presenting circumstances that the *Obduskey* Court did not address – "what *other* conduct (related to, but not required for, enforcement of a security interest) might transform a security-interest enforcer into a debt

collector." 139 S. Ct. at 1039-1040 (emphasis in original). An argument that the letters were antecedent steps required under state law, *see* #43 at 16; *see also* #68 at 31-33, ignores the assumption that defendants did not have *in rem* rights.  The court also views this case as presenting circumstances similar to those in *Moody*, where the notice alleged to be a required antecedent step was sent more than six months after the nonjudicial foreclosure. 2019 WL 7596261, at *8; *see also Hullett*, 2020 WL 2176880, at *5. Judge Laplante rejected the *Obduskey*-based argument in that case.

This case is also arguably similar to *Thompson*, where the defendant "was not acting to enforce a security interest because no security interest existed" by the time it secured the allegedly vacant property and removed the plaintiff's belongings. 800 Fed. Appx. at 371-373. Defendants argue that they do not fall under the primary definition because they were seeking to enforce a security interest notwithstanding the assumption that the security interest did not exist. *Thompson* appears to make available an argument that defendants do not fall under the limited purpose definition if they were seeking to enforce a security interest that in fact did not then exist. It is difficult to believe that Congress intended to exclude defendants seeking to enforce non-existent security interests from both the primary and limited purpose definitions of "debt collector." [42]

---

[42] The court acknowledges that *Thompson* expresses doubt that factual allegations about a defendant's specific conduct in a particular case, which are what plaintiff makes here, *see* #27, suffice; the primary and limited purpose definitions of "debt collector" refer to  "the principal purpose" of a business and the primary definition also refers to a person who "regularly" collects or attempts to collect another's debts, 15 U.S.C. § 1692a(6). *Thompson*, 800 Fed. Appx. at 371-372; *see also Bates*, 958 F.3d at 482. But defendants do not cite this or similar authority, *see* #43 at 13-23. They conflate the primary or limited purpose "debt collector" status determination with a determination of whether defendants' conduct ran afoul of the FDCPA. *See* #50 at 8 (dubbing plaintiff's argument that they do not fall under the limited purpose definition because they were attempting to enforce invalid lien "nonsensical:" "While these allegations might support a claim under 1692f(6), a claim the [p]laintiff does not assert here, the allegations support the fact that the [d]efendants' letters solely pertained to their efforts to enforce a security interest…").

The court's finding that there are sufficient facts in the record from which to plausibly infer actual notice of the discharge order also supports a finding that there are sufficient facts in the record to establish defendants' primary "debt collector" status. There may be a question in cases in which the defendant "frighten[s] homeowners with the threat of foreclosure without showing any meaningful intention of ever actually following through" whether such an entity is "in fact a business 'the principal purpose of which is the enforcement of security interests'" or whether it is "simply using that label as a stalking horse for something else." *Obduskey*, 139 S. Ct. at 1041 (Sotomayor, J., concurring) (quoting 15 U.S.C. § 1692a(6)); *see id*. at 1039 ("enforcing a security interest does not grant an actor blanket immunity"). Similarly, there may be a question in a case in which a defendant sends homeowners letters setting out the amount to be paid to avoid foreclosure knowing that it does not have *in rem* rights.

Defendants' argument regarding the definition of "debt" is likewise unpersuasive. At the April 2, 2024 hearing, counsel for BMPC conceded that a security interest is a "debt." (#68 at 13.) *Obduskey* supports this view. *See* 139 S. Ct. at 1037 ("Foreclosure…is the process in which property securing a mortgage is sold to pay off the loan balance due. ... In other words, foreclosure is a means of collecting a debt") (cleaned up) (citation omitted); *see also Heinz v. Carrington Mtg. Srvcs., LLC*, 3 F.4th 1107, 1113 (8th Cir. 2021) ("…nonjudicial foreclosure is a debt collection activity…").[43] Plaintiff relies on *Arruda*'s "false" debt allegation theory in relation to the obligation to discharged debts related to the second mortgage loan personally, 310 F.3d at 23, *see* #46 at 15; *see also* #68 at 34, and extending *Arruda*, a plaintiff may also bring a claim under the

---

[43] That security-interest enforcers are "*debt* collectors," albeit for a limited purpose, also supports the concession. 15 U.S.C. § 1692a(6) (emphasis supplied). Moreover, § 1692f(6) defines conduct that violates the prohibition on the use of unfair and unconscionable means to collect or attempt to collect "any *debt*." 15 U.S.C. § 1692f (emphasis supplied).

FDCPA by pleading that a debt collector "falsely" alleged a security interest.[44] To be sure, the FAC does not use the word "false," but it refers to the debt as "alleged" and "extinguished" and to the second mortgage lien as "alleged," "extinguished," and "not valid." *See*, *e.g.*, #27 ¶¶ 51, 54, 61, 68. Defendants claim that they were attempting to enforce a security interest and, for present purposes, do not dispute that the second mortgage lien was stripped off in plaintiff's bankruptcy case. The same facts that support a plausible inference of actual notice of the discharge order, together with the "stripped off" assumption, support a finding that plaintiff adequately pled the "false" debt allegation theory.[45]

Regardless, the court rejects defendant's *Arruda*-based argument. That court stated: "…[T]he FDCPA's definition of debt is broad, but it requires at least the existence or alleged existence of an obligation to pay money." 310 F.3d at 13. Defendants place emphasis on "the existence" and "existence," but it is more appropriately placed on "alleged." (#50 at 3.) Even accepting that the letters did not allege the existence of an obligation to pay the $70,000-$80,000 personally, *see* #43-7 (Ex. G) at 2; #43-9 (Ex. I) at 12-13, the letters did allege the existence of a

---

[44] The question in *Arruda* itself was whether plaintiffs adequately pled that Sears "falsely" alleged an obligation to pay discharged debts related to the purchases of household goods personally; as noted, Sears had valid liens. 303 F.3d at 17.

[45] The court does not understand defendants in their Rule 12(c) briefing to be arguing that a debt must actually exist to state a claim under the "false" allegation theory. *See* #43 at 11-13; #50 at 3-7. Nor would such an argument make sense. If the debt actually existed, then the allegation would not be "false." The "false" allegation theory is the "qualification" on the "existence" requirement. *Harrer*, 2016 WL 6995559, at *2.

Defendants point out, *see* #50 at 11, that plaintiff does not allege a § 1692e claim for "use of any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. To the extent that defendants mean to argue that plaintiff must allege a § 1692e claim to pursue the "false" debt allegation theory, that argument is not adequately developed. Anyway, this conflates the determination of "debt" status with the determination of whether defendants' conduct violated the FDCPA. *Arruda* construed the definition of "debt," *see* 310 F.3d at 23, for which there is no so-called "limited purpose" definition.

security interest, which defendants claim they were attempting to enforce and which they concede is a "debt."

Finally, the three discharge injunction cases defendants cite in support of their argument that from the disclaimers, the hypothetical unsophisticated consumer would not have understood that the letters were demands for payment, *see* #43 at 13, did not involve a lien that had been "stripped off." *Best*, 540 B.R. at 13 ("Nationstar was a secured creditor with a lien on the Property") (citing *Lemieux v. America's Servicing Co.*, 520 B.R. 361, 368-370 (Bankr. D. Mass. 2014) (Chapter 7 case; defendants did not fall under bankruptcy injunction's safe harbor provision for "a creditor that is the holder of a secured claim" but because the real property was no longer "the principal residence of the debtor," *see* 15 U.S.C. § 524(j)(1)) (citing *In re Norlund*, 494 B.R. 507, 519-520 (Bankr. E.D. Cal. 2011) (creditor-bank "has not explained its puzzling failure to foreclose on the Hayfork residence. Approximately one year ago, it obtained leave from this court to foreclose on it then failed to do so. In fact, despite knowing that the debtors had vacated the property in anticipation of a foreclosure and had ceased maintaining the property, [the bank] allowed the property to sit idle, be vandalized, and become weed choked. Apparently, [the bank] is uninterested in its collateral and more interested in focusing its attention on the debtors")).

VI. <u>Conclusion and Next Steps</u>.

For the reasons set out above, (#42), defendants' joint motion for judgment on the pleadings is denied. If plaintiff seeks to add class action claims for violation of the discharge injunction, *see* #15-1 ¶¶ 49, 79-82, the parties must submit supplemental briefing addressing the recent decision in *Bruce v. Citigroup Inc.*, 75 F.4th 298 (2d Cir. 2023), holding that a bankruptcy court's civil contempt authority does not extend to other bankruptcy courts' discharge orders. *Id*. at 306. A renewed second motion to amend, if any, must be filed within fourteen days of the issuance of this

Memorandum and Order. If plaintiff does not file a renewed second motion to amend, within twenty-one days of the issuance of this Memorandum and Order, or within seven days of the issuance of the Memorandum and Order on any renewed second motion to amend, the parties shall jointly propose a case schedule and shall indicate whether they request a scheduling conference.

July 10, 2024                                    /s/M. Page Kelley
                                                 M. Page Kelley
                                                 United States Magistrate Judge