UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARTA ESCAMILLA,
     Plaintiff,

      v.                                                            CIVIL ACTION NO. 22-11001-MPK[1]

DYCK-O'NEAL, INC.,
     Defendant.

MEMORANDUM AND ORDER ON THE DEFENDANT, DYCK-O'NEAL, INC.'S,
MOTION FOR SUMMARY JUDGMENT (#95)

MEMORANDUM AND ORDER ON THE PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT (#96)

KELLEY, U.S.M.J.

I. Introduction.

In 2008, Marta Escamilla was struggling financially and fell behind on the mortgage payments for her Everett, Massachusetts condo. Her second mortgage, for $45,000, was then held by Carrington Mortgage Services, LLC ("Carrington"). The Plaintiff also defaulted on her first mortgage and all told, she owed more money to the senior lienholder than her condo was worth. She soon filed for bankruptcy.[2]

During the bankruptcy case, Carrington's claim was treated as unsecured and in 2013, the Plaintiff secured a discharge order which, no party has disputed to date, "stripped off" the second

---

[1] The parties have consented to the assignment of this case to the undersigned for all purposes, including trial and entry of final judgment, pursuant to 28 U.S.C. § 636(c). (#12.)

[2] The Plaintiff's husband was involved in the purchase of their home and subsequent bankruptcy proceedings and he received communications relevant to this case. But, for ease, the court refers merely to "the Plaintiff" in this decision.

1

mortgage. Thus, not only was the Plaintiff no longer personally liable for the debt, Carrington's lien was avoided and unenforceable.

Almost a decade after the bankruptcy court entered the discharge order, Dyck-O'Neal, Inc. ("DONI"), the Defendant here, acquired the second mortgage from Carrington. DONI sent a letter to the Plaintiff about the transfer, telling her to send her payments to DONI, rather than Carrington, after the effective date.

The Plaintiff, who was surprised to receive this letter, had already been working with a mortgage broker to refinance so that she could pay an assessment on her condo. She asked her broker to talk to DONI. But she apparently did not tell him about the discharge order, and there is no evidence in the summary judgment record as to what he did on his own (if anything at all). For its part, DONI appears to have done no due diligence before sending the initial letter to Plaintiff and then informing her broker that if she wanted the "lien" released, she would have to make an acceptable settlement offer. The Plaintiff did make a settlement offer -- $28,000 -- but DONI did not find it acceptable.

After rejecting the settlement offer, DONI learned -- from a "third party vendor" -- that the Plaintiff previously had filed for bankruptcy. To do its due diligence, DONI paused the communications with the Plaintiff. A former employee allegedly reviewed the online bankruptcy docket (and perhaps the discharge order) and determined, incorrectly, that Carrington's lien had not been avoided and was enforceable, resulting in the resumption of communications with the Plaintiff.

This action, under the Fair Debt Collection Practices Act ("FDCPA"), specifically 15 U.S.C. § 1692f(1),[3] and for violation of the discharge injunction, *see* 11 U.S.C. § 524(a), concerns

---

[3] This section provides that

the letters that DONI sent during and after the failed settlement talks, including after DONI learned of the bankruptcy filing and that a discharge order had been secured, as well as the letters sent by the former Defendant, Bendett & McHugh, P.C. ("BMPC"), the law firm used by DONI in attempting to foreclose on the Plaintiff's condo.

DONI moves for summary judgment on both the Plaintiff's FDCPA claim (Count I) and her bankruptcy injunction claim (Count II) insofar as they are based on its June 25, 2021, and October 18, 2021, letters. The Plaintiff moves for summary judgment too, but only on her FDCPA claim. The Plaintiff's motion is denied in full; DONI's motion is largely denied; this case is going to trial.

II. Procedural History.

The Plaintiff filed the original complaint against DONI and BMPC on June 24, 2022. (#1.) The first amended complaint ("FAC"), which is the operative complaint, was accepted for filing on March 29, 2023, *see* #26, and docketed on March 31, *see* #27. DONI and BMPC answered. *See* ##30, 31.

Mostly, but not merely, to assert class action claims, the Plaintiff attempted to file a second amended complaint, twice. *See* ##15, 71. The first motion to file a second amended complaint was

---

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.
…

15 U.S.C. § 1692f(1).

filed before the court had ruled on a motion to file the FAC. After a hearing, the court denied the first motion to file a second amended complaint without prejudice to renewal after the court's ruling on an anticipated motion for judgment on the pleadings. (#39.)

DONI and BMPC then filed the anticipated motion for judgment on the pleadings. (#42.) The court held two hearings and considered supplemental briefing. *See* #67, transcript of March 5, 2024, hearing; #68, transcript of April 2, 2024; *see also* #62. By Memorandum and Order on July 10, 2024, the court denied the motion. (#70.)[4] Relevant aspects of the court's rationale are addressed below.

The Plaintiff then filed the second motion to file a second amended complaint, while DONI and BMPC filed a motion for reconsideration of the denial of judgment on the pleadings, *see* #72. The court denied both motions. (#85.)

The case proceeded to discovery. Before its close, the Plaintiff and BMPC stipulated to the dismissal of the Plaintiff's claims against BMPC with prejudice. (#91.)

After the close of discovery, DONI filed its motion for summary judgment, *see* #95, and the Plaintiff filed her motion for partial summary judgment, *see* #96. Briefing is complete.[5, 6] The court will not hold a hearing. Jury trial is set to start on June 22, 2026. (#109.)

---

[4] This decision is also available at 661 B.R. 676 (D. Mass. 2024).

[5] *See* #102, the Plaintiff's opposition to DONI's motion; #106, DONI's reply.

[6] *See* #97, the Plaintiff's memorandum in support of her motion; #98, the Plaintiff's request for judicial notice; #101, DONI's opposition; #105, the Plaintiff's reply.

III. Preliminary Comments Regarding the Claims in the FAC and Arguments Made by the Parties in their Summary Judgment Papers.

The FAC references five letters. *See* #27 ¶¶ 29-44. The first two were sent by DONI. They are the June 25, *see* #95-2 at 7, and October 18, *see* #95-2 at 8, letters. The other three were sent by BMPC; two were sent on the same day. They are an April 1, 2022, "dunning letter," *see* #102-17, and April 4, 2022, notices regarding the right to cure the mortgage default and the right to request a loan modification, *see* #102-18.

As noted, DONI seeks entry of summary judgment on the Plaintiff's FDCPA and bankruptcy injunction claims to the extent that the claims are based on its June 25 and October 18 letters. (#95 at 2.) In its own motion, DONI makes no argument as to any other communications, including BMPC's dunning and April 4 letters. *See id.*

In its opposition to the Plaintiff's motion, however, DONI asserts that she is seeking summary judgment on unpled FDCPA claims, in particular claims based on its May 25, 2021, letter, *see* #95-2 at 6, and claims based on its communications with her broker, Brian Lindmark. DONI denies that it impliedly consented to amendment of the FAC, and explicitly objects to new claims and evidence. (#101 at 8-9.)[7]

The Plaintiff responds that she generally alleged in the FAC that DONI violated the FDCPA by attempting to collect an alleged debt and wrongfully initiating foreclosure proceedings, *see* #27 ¶¶ 48, 50-51, and that DONI's May 25 letter and communications with Lindmark are "tied to and

---

[7] The Plaintiff also argues in her summary judgment papers regarding BMPC's letters, *see, e.g.,* #97 at 11, and, conspicuously, DONI omits from its list of unpled FDCPA claims any such claims, *see* #101 at 8. It makes no argument that from the FAC, it had inadequate notice of any "agency"-type claims. *Contrast* #27 at 1 (Counts I and II are "against Defendants and their agents….") *with* #101 at 14-18 (opposing entry of summary judgment for the Plaintiff as to the dunning and April 4 letters because BMPC was not attempting to collect a debt and is a "limited purpose" debt collector, *see supra*). Thus it appears that although not captioned as one, DONI's motion is a motion for partial summary judgment.

inform[]" its violations of the FDCPA. She also argues that DONI relies on its May 25 letter, and it is "disingenuous" to argue that she cannot. (#105 at 4.)

The question is not whether DONI's other communications are relevant. As discussed below, they certainly are. The question is whether the court can find that DONI's May 25 letter and communications with Lindmark violated the FDCPA, and enter summary judgment for the Plaintiff on Count I based on that finding. Because the Plaintiff in the FAC does not refer to DONI's May 25 letter and its communications with Lindmark, *see* #27, to find that these communications violated the FDCPA and enter summary judgment for the Plaintiff on Count I based on that finding, the court would have to exercise its discretion to allow the Plaintiff to constructively amend the FAC. *Cf.*, *e.g.*, *Walker v. Experian Information Sols., Inc.*, #22-cv-00299-RAH, 2024 WL 1337851, at *9 (M.D. Ala. Mar. 28, 2024) (wherein the district court declined to "rewrite" the FDCPA claim that was based on the defendant's reports to credit agencies to assert a claim based on its calls with the plaintiff); *cf. also*, *e.g.*, *Diomed, Inc. v. Vascular Sols., Inc.*, 417 F. Supp. 2d 137, 141 (D. Mass. 2006) ("Diomed cannot allege breach of one agreement in its complaint and raise breach of an entirely different agreement when it confronts difficulty in proving its original allegation"); *see generally Katz v. Belveron Real Estate Partners, LLC*, 28 F.4th 300, 308-309 (1st Cir. 2022) (reviewing the district court's refusal to allow constructive amendment at the summary judgment stage for an abuse of discretion). Given the number of opportunities that the Plaintiff had to amend and that the FAC, as drafted, does not provide adequate notice that Count I is based on DONI's May 25 letter and its communications with Lindmark, the court declines to exercise its discretion in this manner.

IV. Summary Judgment Standard and the Record in this Case.

The role of summary judgment in civil procedure is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (cleaned up) (citation omitted). The Federal Rules provide that the district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact has the potential to affect the outcome of the case; "genuine" means that given the evidence, a reasonable jury could resolve the dispute in the non-movant's favor. *John B. Cruz Const. Co., Inc. v. Beacon Communities Corp.*, 169 F.4th 89, 95 (1st Cir. 2026) (quoting *Hamdallah v. CPC Carolina PR, LLC*, 91 F.4th 1, 16 (1st Cir. 2024)).

On a motion for summary judgment, the court takes all facts and reasonable inferences drawn from them in favor of the non-movant, and the movant bears the initial burden to show that there is no genuine dispute of any material fact. *Hamdallah*, 91 F.4th at 16-17; *see Mesnick*, 950 F.2d at 822. To defeat a summary judgment motion, the non-movant must highlight specific facts showing that a reasonable jury could resolve the relevant dispute in the non-movant's favor. *John B. Cruz Const.*, 169 F.4th at 95; *see Hamdallah*, 91 F.4th at 17. "Conclusory allegations, improbable inferences, and unsupported speculation do not count…. Pointing to the mere existence of a scintilla of evidence is also not enough…." *John B. Cruz Const.*, 169 F.4th at 95 (cleaned up) (citations omitted).

This district's local summary judgment rules require the non-movant to file a statement of *disputed* material facts in response to the movant's statement of undisputed material facts. *See* L.R. 56.1; *see also Plourde v. Sorin Grp. USA, Inc.*, 517 F. Supp. 3d 76, 81 (D. Mass. 2021). The statement of disputed facts by the non-movant must address each of the allegedly undisputed facts

7

set out in the movant's statement and be limited to identifying facts that are in dispute, otherwise the facts set out in the movant's statement may be deemed admitted. *See id.; see also Plourde*, 517 F. Supp. 3d at 81. The First Circuit has emphasized the importance of rules such as L.R. 56.1 in preventing litigants from shifting the burden of organizing evidence to the district court and treats the district court's decision to apply them with deference. *Zimmerman v. Puccio*, 613 F.3d 60, 63 (1st Cir. 2010).

The Plaintiff argues that DONI failed to comply with L.R. 56.1 and all the facts she sets out in her statement of material facts should be deemed admitted. (#105 at 2-3.) The court agrees that DONI failed to comply with L.R. 56.1. In its opposition to the Plaintiff's motion, DONI includes a statement of *undisputed* material facts, *see* #101 at 2-8, which L.R. 56.1 does not contemplate, *see Plourde*, 517 F. Supp. 3d at 81, and neither includes a statement of disputed material facts nor states with specificity which of the Plaintiff's asserted material facts are in fact disputed.

But this record is straightforward and although its failure to comply with L.R. 56.1 has created more work for the court, DONI has "not obscured the relevant issues to such an extent as to justify the potentially draconian effect of deemed admission. The court declines to exercise its discretion in this manner…." *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 492, n.1 (D. Mass. 2008). Rather, it has reviewed the summary judgment record in its entirety to identify what material facts are genuinely in dispute.

The court notes here that DONI has added to the summary judgment record with its opposition to the Plaintiff's motion. Specifically, it adds a second declaration of its Director of Bankruptcy and Litigation, Cory Faulkner, *see* #101-1, who makes assertions about DONI's policies and practices that he did not make in his first declaration, submitted with DONI's motion,

*see* #95-2 at 1-4. DONI also adds a declaration of BMPC's Randall McHugh, *see* #101-2 at 1-4, which addresses general business practices and its dunning and April 4 letters. On a summary judgment motion, a court is free to consider other materials in the record, not merely the cited materials, and provided that the parties are given notice and an opportunity to respond, it may even enter summary judgment *sua sponte*. Fed. R. Civ. P. 56(c)(3), (f). The Plaintiff had the opportunity to respond to Faulkner's second declaration and McHugh's declaration in her reply brief. *See* #105. Thus the court considers those declarations on both summary judgment motions. *See*, *e.g.*, *Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019) (rejecting the argument that the district court could not consider materials on the defendants' summary judgment motion when the defendants had only submitted those materials in opposition to the plaintiffs' motion).

V. The Facts.[8]

The Plaintiff bought her condo in 2004. It was her primary residence then and still is now. To buy it, she obtained two loans secured by her condo; the second, junior mortgage loan was for $45,000. At some point prior to the events relevant here, that loan was purportedly assigned by New Century Mortgage Corporation to Carrington. *See* Def.SF (#95) ¶ 1 (citing excerpts of the

---

[8] The facts are drawn from the parties' various statements and the materials in the summary judgment record, with disputes noted. The court refers to DONI's statement of facts in support of its motion, *see* #95 at 3-6, as "Def.SF (#95)," and to the Plaintiff's responsive statement of disputed facts as Pl.R.SDF (#102-2)." It refers to the Plaintiff's statement of facts in support of her motion as "Pl.SF (#97-1)," and to DONI's responsive statement of "undisputed" facts, *see* #101 at 2-8, as "Def.R.SF (#101)." The court cites to only one copy of duplicative materials in the record. When citing to materials in the record, it uses the page numbers assigned by the electronic case filing system, not internal ones.

The court disregards conclusory and unsupported factual assertions in the various statements. It disregards legal conclusions that the parties have asserted as fact. Both parties invite the court to take judicial notice of the bankruptcy proceedings. *See* #95 at 2, n.1 (DONI, generally); *see also* #98 (the Plaintiff, as to Exhibits 1 through 8 and 21 to her motion). The court will do so, to the extent that particular pleadings and orders exist and include certain information, or do not include certain information. *See* #70 at 4-5.

Plaintiff's deposition testimony, *see* #95-1 at 2-5); Pl.R.SDF (#102-2) ¶ 1; Pl.SF (#97-1) ¶¶ 1-2; *see also* #97-21 (the quitclaim deed); #97-22 at 2-5 (the note); *id.* at 6 (a blank assignment); #97-25 ¶¶ 4-5 (the Plaintiff's declaration).

In 2008, the Plaintiff defaulted on the second mortgage loan and in 2010, she filed for Chapter 13 bankruptcy in the United States Bankruptcy Court for the District of Massachusetts, #10-bk-12071. *See* Def.SF (#95) ¶¶ 2-4; Pl.R.SDF (#102-2) ¶¶ 2-4; Pl.SF (#97-1) ¶¶ 3-4; *see also* #97-25 ¶¶ 6-7 (the Plaintiff's declaration); #97-3 (the docket); #97-23 (the petition, #10-bk-12071, #1).

On the Plaintiff's motion, the bankruptcy court entered a discharge order in 2013. There is no dispute that during the bankruptcy proceedings, Carrington's claim was treated as unsecured and that as a result of the discharge order, not only was the Plaintiff's debt extinguished, but Carrington's lien was stripped off. *See* Def.SF (#95) ¶¶ 7-8; Pl.R.SDF (#102-2) ¶¶ 7-8; Pl.SF (#97-1) ¶¶ 9, 11; Def.R.SF (#101) ¶¶ 7-8; *see also* ##97-8 (the motion, #10-bk-12071, #63); #97-9 (the order, #10-bk-12071, #65).[9]

DONI argues that before June 30, 2021, it did not have adequate notice of the discharge order and its effect on Carrington's lien and so the court focuses on evidence of notice preceding

---

[9] On the motion for judgment on the pleadings, the Defendants had only assumed "strip off." *See* #70 at 1-2 & n.3. As the court explained then, generally a bankruptcy discharge only prevents a creditor from bringing an action against the debtor *in personam*, and does not prevent the creditor from bringing an action against the debtor *in rem*. A lien remains enforceable unless it is avoidable and the debtor takes proper steps to avoid it during the bankruptcy case. "Strip off" in this context means the entry of an order that discharges a creditor's mortgage lien on real property where that mortgage is determined to have no value because the amount of senior liens and encumbrances exceeds the value of the property. "Strip off" avoids the lien and the creditor can no longer bring an action against the debtor *in rem*. *See id*. at 2, n.2 (and authorities collected).

10

that date.[10] The discharge order itself did not state that Carrington's lien was stripped off. *See* #97-9. Nor is the treatment of Carrington's claim apparent from the online docket sheet. *See* #97-3.

In the Plaintiff's bankruptcy petition, Carrington was identified as a creditor and listed in the matrix. *See* #97-23 at 25, 47. Moreover, the Plaintiff's amended Chapter 13 bankruptcy plan stated that Carrington's claim would be treated as unsecured, explaining that the Plaintiff's condo was worth just $145,000 and was subject to a first mortgage and the amount owing to that senior lienholder was $182,934. The amended plan further stated that the discharge order "shall constitute a discharge of the mortgage held by Carrington and described hereinabove." *See* #97-4 at 3-4 (the amended plan, #10-bk-12071, #21 at 2-3).

The bankruptcy court entered an order confirming the amended plan. *See* #97-5 (the order, #10-bk-12071, #30). DONI does not contend that the post-confirmation proceedings altered the treatment of Carrington's claim, *see* #97-6 at 3-4 (the post-confirmation amended plan, #10-bk-12071, #38 at 2-3); *see also* #97-7 (the order, #10-bk-12071, #47), and the bankruptcy trustee's final report confirms that Carrington's claim was treated as unsecured, *see* #97-10 at 2 (the final report, #10-bk-12071, #68 at 1).

The amended plan, the post-confirmation amended plan, and the motion for discharge all included certificates of service indicating service on Carrington. *See* #97-4 at 7; #97-6 at 7; #97-8 at 5. But there is no evidence in the summary judgment record from Carrington directly, and that includes evidence of Carrington's actual receipt of these bankruptcy pleadings.

In 2020, the Plaintiff's condo association imposed a $14,000 assessment on her condo. She planned to refinance her mortgage to pay the assessment and for help with refinancing, she hired

---

[10] As discussed below, the parties dispute whether actual notice is required or whether constructive notice suffices.

a mortgage broker, Lindmark. Lindmark told the Plaintiff that Carrington held a lien on her condo. At her deposition, the Plaintiff could not recall if she told Lindmark that she previously had filed for bankruptcy and that the second mortgage loan was part of those proceedings. *See* Def.SF (#95) ¶¶ 9-12 (citing excerpts of the Plaintiff's deposition testimony, *see* #95-1 at 7-12); Pl.R.SDF (#102-2) ¶¶ 9-12. In her declaration, the Plaintiff does not attest that she in fact told Lindmark that she previously had filed for bankruptcy and that the second mortgage loan was part of those proceedings. *See* #97-25.

In 2021, Carrington sold the second mortgage loan to DONI as part of a portfolio. *See* Def.SF (#95) ¶ 13 (citing Faulkner's first declaration, *see* #95-2 ¶ 6); Pl.R.SDF (#102-2) ¶ 13. DONI asserts that it has an understanding with Carrington that Carrington will not include in portfolios sold to DONI any debts or liens that have been discharged in bankruptcy, and that Carrington does not have a prior history of selling debts to DONI that have been discharged in bankruptcy. *See* Def.SF (#95) ¶¶ 14-15. These assertions are supported by citation to Faulkner's first declaration, *see* #95-2 ¶¶ 7-8, and it is reasonable to infer that Faulkner, as Director of Bankruptcy and Litigation, *see id*. ¶ 3, with about 20 years of experience, *see* #97-19 at 10, has personal knowledge of DONI's agreements with Carrington and Carrington's prior history of sales to DONI.

The Plaintiff disputes these assertions, citing excerpts of Faulkner's deposition testimony, *see* Pl.R.SDF (#102-2) ¶¶ 14-15, but she has made just two of the three cited excerpts part of the

summary judgment record. Neither show that Carrington had a prior history of selling *discharged* debts or liens to DONI.[11]

Faulkner testified at his deposition that DONI typically does not seek to enforce its security interests on unsecured second mortgage loans. Rather, when its claim is being treated as unsecured in a bankruptcy case, DONI waits until the end of the case to determine next steps and if the discharge order states that the lien is to be released, then DONI releases the lien. (#97-19 at 20-21.)

On April 27, 2021, DONI sent the Plaintiff a letter. *See* Def.SF (#95) ¶¶ 16-17 (citing Faulkner's first declaration, *see* #95-2 ¶¶ 9-10, citing the April 27 letter, *see* #95-2 at 5); Pl.R.SDF (#102-2) ¶¶ 16-17; *see also* #97-18, DONI's "Debtor Overview Report," at 2.[12, 13] The letter stated, in part: "The ownership and servicing of your former Carrington Mortgage Services, LLC mortgage loan is transferring to Dyck-O'Neal, Inc.," effective May 1, 2021. (#95-2 at 5.) The letter stated that the principal balance at the time of the transfer was $67,220.62, and that the Plaintiff

---

[11] The Plaintiff cites testimony at pages 30, 52, and 53, but has only made pages 30 and 52 part of the summary judgment record. *See* #97-19; *see also* #102-20; #105-2. The cited excerpts in the record establish merely that among the mortgage-related debts DONI handles, "[a] small percentage are in bankruptcy or will file bankruptcy after [DONI] acquire[s] them," *see* #97-19 at 18, and that Exhibit 2 at Faulkner's deposition was DONI's purchase and sale agreement on some accounts from Carrington, *see id.* at 22.

[12] The Debtor Overview Report is attached to Plaintiff's counsel's affidavit, and counsel identifies the attachment as the one authenticated by Faulkner at his declaration. (#97-2 ¶ 20.) The court presumes that Faulkner's declarations are based at least in part on the Debtor Overview Report, as he claims that his assertions are based on personal knowledge and review of relevant business records. (#95-2 ¶¶ 4-5; #101-1 ¶¶ 4-5.)

[13] The April 27 letter is referred to as a "Hello Letter" in the Debtor Overview Report, although that report indicates that it was sent the day before, *see* #97-18 at 2; *see also* #97-19 at 5, 34-35. The letter is automatically generated, pulling information from DONI's "ADS" system. (#97-19 at 31, 35.)

should continue sending her payments to Carrington before May 1, but beginning May 1, should send her payments, and any correspondence, to DONI. *Id*.

At the bottom of the letter, the following language appeared:

This letter is for information purposes only. This letter is not a demand for payment or a request for payment of any funds previously discharged in bankruptcy or subject to an automatic stay. If you have filed for bankruptcy protection and your loan is either subject to the automatic stay of collection efforts or has been discharge [sic] in bankruptcy and is no longer owing, please call our bankruptcy specialist, Cory Faulkner, at 1-800-447-2481 ext. 2101.

*Id*.[14]

Faulkner testified at his deposition that it is DONI's understanding that this Hello Letter must be sent on any secured note when the note is transferred. (#97-19 at 24.) According to Faulkner, a Hello Letter is not necessarily sent only after DONI receives results from Lexis Nexis of its "scrub" of an account for bankruptcy information. *Id*. at 23-24; *see also id*. at 33. In this case, the letter was sent before DONI even asked Lexis Nexis to "scrub" the account -- on May 5, 2021. (#97-18 at 2); *see* #97-19 at 33.[15]

---

[14] The letter appears to have had a second page. *See* #95-2 at 5 ("Please see the following page…"). But both parties submit only one page. *See id*.; *see also* #97-11, #102-12.

[15] The Plaintiff attaches to her reply brief an excerpt of Faulkner's deposition testimony in which he expressed doubt that Lexis Nexis returns information on bankruptcies that occurred more than seven years prior:

A. Most -- a lot of accounts aren't -- if it's over seven years, they don't send returns back.

Q. Okay. So if the bankruptcy happened more than seven years ago, Lexis Nexis does not scrub for that information?

A. I -- I'm not 100 percent certain, but I believe that is correct.

The letter was also sent before DONI received "the collateral file & assignments" from Carrington. Per the Debtor Overview Report, DONI "ha[d] not recvd collateral file." (#97-18 at 2.) Between May 11 and June 3, 2021, DONI repeatedly contacted Carrington for the collateral file and, on June 7, Carrington finally shipped it. *Id*. at 2-3.

DONI employee Elena Castro recorded in the Debtor Overview Report that on June 9, 2021, the collateral file was received and scanned, with the original "on Allen's desk." (#97-18 at 3. Castro recorded a list of documents in the collateral file:

> Rec'd and scanned collateral file-contains Original Note w/blank endorsement, Original Mortgage (unrec), AOM-New Century to Blank (orig-unrec.), Title Policy, copy of recorded Mortgage to zdrive folder
> No Bailee Letter in file-saved checklist to zdrive folder
> Placed original collateral file on Allen's desk and emailed Sue to let them know
> AOM is not properly executed as it is missing Notary stamp and signature

*Id*.

The "original" collateral file has not been made part of the summary judgment record and "Allen" has not submitted a declaration. Nor has the court been provided with any excerpts of his deposition testimony, if he was deposed.

---

(#105-2 at 5.) He denied that a DONI employee reviewing an account in which a bankruptcy occurred more than seven years prior would know about this limitation of the "scrub" by Lexis Nexis, and explained that the employee would know about the bankruptcy filing from "the client, the borrower…or some other third party," like an attorney, real estate agent, or title company. *Id*. at 6.

The same goes for Castro: no declaration and no deposition testimony excerpts, if she was deposed. There is no indication from her list, above, that the collateral file included bankruptcy information and, as noted, there is no evidence in the summary judgment record from Carrington directly. Apart from entries regarding the "collateral file & assignments," *see supra*, and an updated loan balance, *see infra*, the Debtor Overview Report does not reflect communications between DONI employees and Carrington employees before June 30, 2021. *See* #97-18 at 1-4.

DONI asserts that in response to the April 27, Hello letter, the Plaintiff "did nothing," quoting her deposition testimony. *See* Def.SF (#95) ¶ 19 (quoting #95-1 at 6-7.) The Plaintiff disputes this assertion, *see* Pl.R.SDF (#102-2) ¶ 19, citing her declaration, executed after her deposition. Regardless, DONI's assertion is not supported by the Plaintiff's deposition testimony. She did initially testify that she "did nothing" other than talk to her daughter about the letter, but then denied that she "put [that letter] aside," explaining that she also talked to Lindmark. (#95-1 at 7-8).

Furthermore, it is undisputed that, on May 11, 2021, Lindmark and the Plaintiff called DONI, which is assuredly not "d[oing] nothing." *See* Def.SF (#95) ¶ 21 (citing Faulkner's first declaration, *see* #95-2 ¶ 12); Pl.R.SDF (#102-2) ¶ 21. The Plaintiff attests that she "was confused and shocked to receive [the April 27] letter since it had been over 10 years since [she] filed for bankruptcy and [she] thought [her] obligations with respect to the Carrington mortgage were resolved." (#97-25 ¶ 10.) "Shortly after receiving [it]," she contacted Lindmark to help her get more information from DONI; later, she went to his office and they called DONI together. *Id*. ¶¶ 11-12.

DONI asserts that during the May 11 call, neither Lindmark nor the Plaintiff told DONI that the Plaintiff previously had filed for bankruptcy. *See* Def.SF (#95) ¶ 22. This assertion is

supported by citation to Faulkner's first declaration. Faulkner does not identify himself as one of the DONI employees with whom Lindmark and the Plaintiff spoke that day. *See* #95-2 at 1-4. He was not. According to the Debtor Overview Report, on May 11, 2021, Lindmark and the Plaintiff first spoke to Veronica Segura and then to Raymond Spangler. (#97-18 at 2.)

Faulkner does not explain in his declaration how he knows that during the May 11 call, neither Lindmark nor the Plaintiff told Segura or Spangler that the Plaintiff previously filed for bankruptcy. *See* #95-2 at 1-4. It is reasonable to infer, however, that his assertion is based on the absence of an entry on the Debtor Overview Report, or other business record, to that effect. *See, e.g.*, #97-19 at 40-41.

But Segura did record this entry in the Debtor Overview Report: "inc call Marta, [redacted] 1307, she auth me to spk to atty Brian, cllr sd that bor is trying to refinance, cllr sd bor tought loan had modified, atty sd that bor had not heard about this and they want this release, xfer to Raymond." (#97-18 at 2.)

And Spangler did record this entry in the Debtor Overview Report: "…<span style="color:red">Marta thought the loan was modified with t…he 1st she understand that did not happen, has not heard anything since 2009, he want the lien release, advised need settlement offer, they will put one together, will email me autho and offer….bal 67,220.62 advised online pay and auto pay.</span>" (#97-18 at 2.)

Yet Segura, Spangler, and most notably, Lindmark, have not provided declarations and if they were deposed, the court does not have excerpts of their testimony. For her part, the Plaintiff does not attest to the use of the word "bankruptcy." Rather, she attests that on the May 11 call, "DONI was informed…that [she] had not heard anything from Carrington about the mortgage since approximately 2009 and that [she] thought the loan was resolved." (#97-25 ¶ 14); *see also* Pl.R.SDF (#102-2) ¶ 22.

17

At the time of his deposition, Faulkner "ha[d] no information about" whether DONI did any investigation into the Plaintiff's representation that she had not "heard about this" or "heard anything since 2009." *See* #97-19 at 41. He did not know if there was any policy at DONI for debts that are over ten years old. *Id.*[16]

On May 18, 2021, Lindmark emailed Spangler about payments on the Plaintiff's account. *See* Def.SF (#95) ¶ 24 (citing Faulkner's first declaration, *see* #95-2 ¶ 15); Pl.R.SDF (#102-2) ¶ 24. Spanger told Lindmark that payments were due since December 2003, but had not been made. *See* Def.SF (#95) ¶ 25 (citing Faulkner's first declaration, *see* #95-2 ¶ 16); Pl.R.SDF (#102-2) ¶ 25; *see also* #97-18 at 3 ("recvd email from Brian, the underwriter wants to know if payment were due since 12/1/03 advised payments were due they just are not being paid").

On May 25, 2021, DONI sent the Plaintiff a letter. *See* Def.SF (#95) ¶ 26 (citing Faulkner's first declaration, *see* #95-2 ¶ 17, citing the May 25 letter, *see* #95-2 at 6); Pl.R.SDF (#102-2) ¶ 26. The letter, over Jori O'Neal's name, explained that

> [a]fter a careful audit of your file, we have determined that an error was made in the data regarding the amount owing which was previously quoted to you. The correct balance as of the date of this letter is $80,112.95. Because of interest, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your check, in which event we will inform you before depositing the check for collection. We apologize for any inconvenience this may have caused you.

---

[16] In his second declaration, Faulkner attests to some policies at DONI, including that "a) When DONI learns that an obligor may have filed for bankruptcy, it ceases collection activities on the account to investigate the bankruptcy." (#101-7 ¶ 7(a).) Thus, presumably, he would claim to know that during the May 11 call, neither Lindmark nor the Plaintiff told Segura or Spangler that the Plaintiff previously had filed for bankruptcy because until June 30, 2021, DONI did not cease collection activities in order to investigate. *See* #95-2 ¶ 14; *see also id.* ¶ 25.

(#95-2 at 6.)[17] The Plaintiff was told to contact O'Neal "within thirty (30) days from [her] receipt of this letter to discuss [her] options." *Id*. The following language appeared near the bottom of the letter:

> NOTE: This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

*Id*.

That same day, Lindmark emailed Spangler offering to resolve the debt. *See* Def.SF (#95) ¶ 28 (citing Faulkner's first declaration, *see* #95-2 ¶ 18); Pl.R.SDF (#102-2) ¶ 28. According to Spangler's May 25 entry on the Debtor Overview Report: "Recvd email from Brian Lindmark the mortgage banker Marta current income and expenses not allow her to borrow more than 28,000.00 to payoff this loan, he is asking if we will accept it, that's the best they can do." (#97-18 at 3.)[18] Spangler apparently "emailed Jori the offer," and on May 27, O'Neal recorded this entry in the Debtor Overview Report: "zillow value is 364K." *Id*.

DONI asserts, and the Plaintiff does not dispute, that on June 1, 2021, Lindmark again offered to resolve the debt. *See* Def.SF (#95) ¶ 29 (citing Faulkner's first declaration, *see* #95-2 ¶ 19); Pl.R.SDF (#102-2) ¶ 29. The Debtor Overview Report does not show any June 1 activity. (#97-18 at 3.) But, on June 2, Spangler apparently "emailed Brian for a copy of a current statement of payoff quote for the 1st;" "recv payof quote from the 1st 138,219.79;" "emailed Jori the offer;"

---

[17] This is what the Debtor Overview Report and Faulkner refer to as the "bona fide error letter." According to Faulkner, "audit" referred to "the updated balance received from the client," on May 11. *See* #97-18 at 2-3; *see also* #97-19 at 33-34, 37-38. Faulkner did not know if any other audit had been performed at this point: "I do not know and I have no reference of it." (#97-19 at 38.)

[18] The Plaintiff recalls authorizing Lindmark to offer DONI $28,000 to settle the alleged debt, which was all she could afford, so that DONI would agree to release the lien. (#97-25 ¶ 17.)

"called autho Brian" and "Left Message on Recorder,"[19] and when Brian called back, Spangler told him "we can not settle for 28k he said her debt to income willnot allow her to refi for more than 50% he is going to email me the findings on the reason she can not refi for more." *Id*.

The Plaintiff attests that in early June 2021, she "was informed by [Lindmark] that DONI rejected [her] $28,000 offer to resolve the debt DONI was claiming [she] owed," and further that:

> Since DONI was not willing to settle the alleged debt or release the lien it claimed to have, [Lindmark] was unable to continue assisting me as of about June of 2021. I was also unable to refinance my property as a result of the issues I was experiencing with DONI.

(#97-25 ¶¶ 18-19.)[20]

Per the Debtor Overview Report, Lindmark reached out for a status update on June 11, and called again on June 15. Per his entries on the Debtor Overview Report, on that date, DONI employee Cade Menger spoke to Lindmark and told him that the "$28K declined." The entry continues: "He sd it is max she will approve for. I sd sale or FC may be in our best ibterest. Home valued at $350K 1st for $138K. He has to pay off her cards w/ iur equity." (#97-18 at 3.)[21]

---

[19] None of the emails referred to in the Debtor Overview Report are part of the summary judgment record and the court does not know what "the 1st" refers to, although it could possibly refer to the first mortgage loan.

[20] DONI argues that the Plaintiff "false[ly]" claims injury based on an inability to refinance: "[H]er entire case is premised on the fact that **no** 'lien on her property' existed because it was stripped by the Bankruptcy Court." (#106 at 3) (emphasis in original). But DONI does not explain how a homeowner would be able to refinance notwithstanding that a lienholder is asserting that it holds an enforceable lien and is refusing to release it. More importantly, DONI presents no evidence to this effect. Nor does it present evidence that it was actually willing to release the lien. Faulkner testified at his deposition that it remains "undetermined" whether the Plaintiff owes DONI money "until this [i.e. this lawsuit] is determined." (#97-19 at 30.)

[21] At his deposition, Faulkner guessed that by "our best [interest]," Menger meant DONI's best interest. (#97-19 at 39-40.)

DONI asserts, and the Plaintiff does not dispute, that on June 24, 2021, Lindmark called DONI and asked for a payoff amount on the debt and in response to Lindmark's request, on June 25, DONI sent the Plaintiff the "payoff" letter. *See* Def.SF (#95) ¶¶ 30-31 (citing Faulkner's first declaration, #95-2 ¶¶ 20-21, citing the June 25 letter, *see* #95-2 at 7); Pl.R.SF (#102-2) ¶¶ 30-31.

Per Menger's June 24 entry on the Debtor Overview Report, Lindmark called and Menger spoke to him; Lindmark "Sd would like a payoff sent and would also like to know subordination requirements," and Menger responded that he would "relay to Raymond." (#97-18 at 4.) Per Spangler's June 24 entry, he "emailed Debra to mail a payoff quote to the address on file" and per Debra Burris's June 25 entry, she "[m]ailed payoff letter to MR/MS iao $80351.36 good thru 7/5/21 - $11.34 per diem." *Id*.

The June 25 letter, over Spangler's name, showed a "**Balance as of today**" of "**$80,237.97**," and stated that "[t]he payoff amount on the 2nd lien Mortgage good through July 5, 2021 is $80,351.36…." (#95-2 at 7.) The letter also provides DONI's "**Wiring Information**" and "**Overnight Mailing Address**." *Id*. The following language appears near the bottom:

> NOTE: This communication is from a debt collector. This firm is attempting to collect a debt, and any information obtained will be used for that purpose.

*Id*.[22]

DONI argues that the Plaintiff as a matter of law lacks standing to raise an FDCPA claim based on its June 25 letter, *see* #95 at 6-9, and asserts as a matter of fact that it would not have sent the letter had Lindmark not requested a payoff amount. *See* Def.SF (#95) ¶ 32 (citing Faulkner's first declaration, *see* #95-2 ¶ 22). Relying on Faulkner's testimony at his deposition that because

---

[22] The Plaintiff attests that she was "distressed" to receive the June 25 letter because she was "unsure" how she would come up with the money to pay the alleged debt, and she began to grow worried that DONI would foreclose on her home. (#97-25 ¶ 20.)

the debt was in default, DONI was attempting to collect it, *see* #97-19 at 18, the Plaintiff disputes the factual assertion. *See* Pl.R.SDF (#102-2) ¶ 32. The Plaintiff also counters the legal claim, *see* #102 at 8-12, which the court addresses below.

Per his entries on the Debtor Overview Report, on June 29, Spangler received an email from Lindmark and told him that DONI does not "subordinate" or "refinance" but that they could "look at a modification," adding "the 1st letter was just the PB, the 2nd had the intestest add from the next due payment 12/08 interest rate 9.990%." (#97-18 at 4.) Spangler also apparently "emailed Cory F to mail out the modification requirements." *Id*.

The court presumes that Faulkner did not "mail out the modification requirements." On June 30, DONI employee "Lazo Va" made the following entries on the Debtor Overview Report:

> both debtors filed bk 2/28/20-case dischg 6/27/13 and term 8/9/13- to bky and al
> ison to review
> Bankruptcy Filed
> ***Bankruptcy record Saved by: valazo

(#97-18 at 4.)[23]

Lazo has not submitted a declaration and if she was deposed, the court does not know what she said. Faulkner, however, testified that Lazo did not review "internal documents of the bankruptcy" or "the entire length of the bankruptcy," only "the summary of the case." (#97-19 at 42-43.) He could not testify to the exact source of the summary. He did not know if Lazo got it from Lexis Nexis or if Spangler gave it to her. *Id*. at 43.

Ultimately, the parties do not dispute that on June 30, 2021, DONI learned from a "third-party vendor" that the Plaintiff previously had filed for bankruptcy. *See* Def.SF (#95) ¶ 34 (citing

---

[23] The court does not know what documents were included in the saved "Bankruptcy record." Faulkner may have offered some testimony at his deposition, but if he did, that testimony has not been made part of the summary judgment record. *See* #97-19 at 46.

Faulkner's first declaration, *see* #95-2 ¶ 24); *see* Pl.R.SDF (#102-2) ¶ 34. As noted, though, the parties do dispute whether this is when DONI first learned that the Plaintiff previously had filed for bankruptcy, or whether DONI learned that the Plaintiff previously had filed for bankruptcy earlier than June 30. (#102 at 14); *see* Pl.R.SDF (#102-2) ¶ 34.

DONI cites generally to Faulkner's first declaration and asks the court to conclude that there is no genuine dispute that DONI first learned that the Plaintiff previously had filed for bankruptcy on June 30, 2021, claiming not only that the Plaintiff and Lindmark did not tell Segura or Spangler about the bankruptcy filing on the May 11 call, but also that Carrington did not tell DONI about the bankruptcy filing when it sold the second mortgage loan to DONI. (#95 at 9.) The latter assertion is not made in DONI's statement of facts, *see* #95 at 3-6, and it is not supported by the general citation to Faulkner's first declaration. Faulkner does not explicitly attest that Carrington did not tell DONI about the bankruptcy filing when it sold the second mortgage loan to DONI. *See* #95-2 at 1-4. However, he did testify at his deposition that he "cannot answer" whether "there was any suspicion or confirmation that there had been prior bankruptcy proceedings" by May 11, *compare* #97-19 at 36 *with* #97-18 at 2, adding: "I'm not aware." (#97-19 at 36.) Asked later in his deposition if by June 15, *see id*. at 39; *see also* #97-18 at 3, DONI was on notice of any bankruptcy in relation to the account, he testified:

> Again, based on there's no comments of the bankruptcy, no comments from the borrower, *no comments from the lender*, no comments from the title company of any bankruptcy.

(#97-19 at 40-41) (emphasis supplied).[24]

---

[24] Although DONI did not submit or cite to the transcript, the court notes that Faulkner expressly testified at his deposition that June 30, 2021, was "the first time that Dyck-O'Neal was on notice of any bankruptcy related to this account:" "That is correct." (#97-19 at 42); *see id*. at 43 ("we had determined in June that that's -- there was a bankruptcy involved that we were unaware of").

It is undisputed that DONI did not contact the Plaintiff again "until after the bankruptcy docket was reviewed." *See* Def.SF (#95) ¶ 35 (citing Faulkner's first declaration, *see* #95-2 ¶ 25); Pl.R.SDF (#102-2) ¶ 35. And indeed the Debtor Overview Report does not show either that DONI contacted Lindmark or the Plaintiff or that Lindmark or the Plaintiff contacted DONI between June 30 and October 18, 2021. *See* #97-18 at 4.

Faulkner attests, and DONI asserts, but the Plaintiff disputes, that on October 18, 2021, "an employee [Alison Tafoya, *see* #97-18 at 4; *see also* #97-19 at 45[25]] reviewed the bankruptcy docket and mistakenly concluded 'Lien was not avoided in bk.'" *See* #95-2 ¶ 26; *see also* Def.SF (#95) ¶ 36; Pl.R.SDF (#102-2) ¶ 36.[26] Tafoya has not submitted a declaration and if she was deposed, the court does not know what she said. Moreover, Faulkner does not explain his conclusion that Tafoya's conclusion was simply "mistaken[]."[27]

There are three October 18 entries on the Debtor Overview Report. The "System Th" entered "Letter #76: Bky Please Call Sent to" the Plaintiff, at about 1:11 p.m. And Tafoya entered

---

[25] Per Faulkner's excerpted deposition testimony, Tafoya left DONI in 2024. (#97-19 at 25.)

[26] Faulkner does not know if anyone else reviewed the bankruptcy docket. "There are no other notes to say yes or no." (#97-19 at 48); *see also id.* at 50.

[27] However, these are the other DONI policies that Faulkner identifies in his second declaration: "b) A DONI employee trained to review bankruptcy dockets then reviews the online docket to try to determine the status of matter and whether any orders have been entered that impact the debt or lien at issue"; "c) DONI knows from experience and education that liens are not subject to automatic discharge in a Chapter 13 bankruptcy"; "d) Based on DONI's experience, it knows that if a lien has been discharged, the discharge order reflects that fact"; "e) DONI therefore educates its employees to review the final discharge order to determine whether it reflects the fact the lien DONI is trying to collect has been discharged"; "f) If a discharge order has been entered, the employee is required to review that order to determine whether the lien has been discharged"; and "g) Based on its experience and education, DONI knows that unless the discharge order indicates the lien has been discharged, the lien remains even if the financial obligation secured by the lien has been discharged." (#101-1 ¶ 7(b)-(g).)

"Lien was not avoided in bk sending letter" at about 1:12 p.m., and "Misc - reviewed account" at about 1:13 p.m. (#97-18 at 4).

On October 18, DONI's "Bankruptcy Department" sent the Plaintiff a letter that stated that it "**IS FOR INFORMATIONAL PURPOSES ONLY. THIS LETTER IS NOT A DEMAND FOR PAYMENT OR A REQUEST FOR PAYMENT OF ANY FUNDS PREVIOUSLY DISCHARGED IN BANKRUPTCY OR SUBJECT TO AN AUTOMATIC STAY.**" The letter indicated that DONI held a lien against the property and set out a "lien balance" of $80,712.11 *See* Def.SF (#95) ¶ 37 (citing Faulkner's first declaration, *see* #95-2 ¶ 27, citing the October 18 letter, *see* #95-2 at 8); Pl.R.SDF (#95) ¶ 37.

> The October 18 letter stated, in its body:
>
> This letter is for information purposes only. The sole purpose of this letter is to advise you that Dyck-O'Neal, Inc. continues to hold a mortgage lien against the referenced property.
>
> Your personal liability pertaining to the debt associated with the referenced property may have been discharged in your Bankruptcy case. Nevertheless, Dyck-O'Neal, Inc. still retains lien rights as to the property.
>
> You are not required to respond to this letter. However, we would appreciate hearing from you as to your current intentions relating to the property, whether you wish to retain ownership of the property, sell the property, or abandon your interest in the property.
>
> We respectfully request you contact us at your earliest convenience….

(#92-5 at 8.) The "Amount owing of lien balance as of the date of this letter" appeared near the bottom of the letter, as did a warning that "the amount due on the day you pay may be greater" "[b]ecause of interest." The following language also appeared near the bottom of the letter:

> NOTE: This communication is from a debt collector. This firm is attempting to collect a debt and any information obtained will be used for that purpose.

25

*Id.* [28]

On or around January 26, 2022, DONI referred the account to BMPC to begin foreclosure proceedings for DONI. *See* #97-19 at 25, 50; #97-18 at 4. According to Faulkner, BMPC "received the entire account, which…should have included the bankruptcy information." (#97-19 at 51.) Faulkner did not know what policies BMPC had in place but because BMPC is a law firm, DONI "expect[ed]" BMPC to do its own investigation. *Id.*

As noted, DONI has submitted Randall McHugh's declaration. (#101-2.) McHugh attests that before taking any action, BMPC did a bankruptcy "scrub" and when the scrub revealed a bankruptcy case involving the Plaintiff, BMPC reviewed "the scrub results" to determine that the case was closed, and thus no automatic stay was in force. *Id.* ¶¶ 8-9. BMPC allegedly found no indication that the mortgage had been discharged, either from "the scrub results" or a title search. *Id.* ¶ 9.

On April 1, 2022, BMPC sent the Plaintiff the dunning letter. *See* #102-17 (the dunning letter).[29] On the first page, the letter stated:

> **Bendett & McHugh, P.C. is a debt collector**. We are trying to collect a debt that you owe Dyck-O'Neal, Inc. We will use any information you give us to help collect the debt.

(#102-17 at 2.) The letter included, *inter alia*, the "**Total amount of the debt now**," **$81,371.64**, and explained the Plaintiff's options "**to dispute all or part of the debt**," among other things. *Id.* The following language appeared on the second page:

---

[28] The Plaintiff attests that this letter "only added to [her] stress on how [she] was going to resolve the alleged debt with DONI." (#97-25 ¶ 21.)

[29] McHugh attests that this "was a debt validation letter sent to the Plaintiff to comply with Federal and Massachusetts law…." (#101-2 ¶ 11.)

> **NOTICE: This law firm is a debt collector and is attempting to collect a debt. Any information will be used for that purpose. Please note, however, that if you have previously received a discharge in bankruptcy which discharged this debt or the collection of the debt is prohibited by the automatic bankruptcy stay, this law firm is not attempting to collect a debt, but is only enforcing a lien against the subject property.**
>
> **\*PLEASE ALSO NOTE: If you are not personally obligated to pay this debt but are a mortgagor due to your ownership interest in the subject real property, you are receiving this notice for informational purposes only and you are neither obligated to pay the debt nor entitled to dispute the same. If this describes you, this law firm is not attempting to collect a debt from you, but is only enforcing a lien against the subject property**.

*Id*. at 3.

On April 4, 2022, an attorney with BMPC sent the Plaintiff a "**90 DAY RIGHT TO CURE YOUR MORTGAGE DEFAULT**" letter, *see* #102-18 at 2-9, and a "**RIGHT TO REQUEST A MODIFIED MORTGAGE LOAN**" letter, *see id*. at 10-13.[30] The latter letter warned, in part: "**If you do not return the enclosed Mortgage Modification Options form and a competed loan modification application by May 4, 2022 your right to cure your mortgage default will end on July 3, 2022**." *Id*. at 11.

The former letter stated that BMPC was contacting the Plaintiff because she did not make her monthly loan payments due December 1, 2008, to April 1, 2022; listed each of the months from December 2008 to April 2022; stated that she "must pay the past due amount of $69,869.17 on or before July 3, 2022;" and listed the past due amounts for each of the months from December 2008 to April 2022, over multiple pages. (#102-18 at 2-7.)  The letter also advised that after July 3, 2022, the Plaintiff could "still avoid foreclosure by paying the total past due amount before a foreclosure sale takes place," noting that there may be other ways to avoid foreclosure, such as

---

[30] McHugh attests that these letters are "condition[s] precedent" to commencing foreclosure under Mass. Gen. Laws. ch. 244, §§ 35A and 35B, and 209 C.M.R. §§56.03, 56.04, 56.05, and 56.09. (#101-2 ¶¶    14, 16.)

selling the property, refinancing her loan, or voluntarily transferring ownership of the property to

DONI. *Id*. at 8. The letter then warned:

> **If you do not pay the total past due amount of $69,869.17 and any additional payments that may become due by July 3, 2022, you may be evicted from your home after a foreclosure sale. If Dyck-O'Neal, Inc. forecloses on this property, it means the mortgagee or new buyer will take over ownership of your home.**

*Id*.

> After the signature line, on a separate page, the following language appeared:

> **NOTICE: THE LAW FIRM OF BENDETT & MCHUGH, P.C. IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. IF YOU HAVE PREVIOUSLY RECEIVED A DISCHARGE IN BANKRUPTCY WHICH DISCHARGED THIS DEBT, THIS CORRESPONDENCE IS NOT AND SHOULD NOT BE CONSTRUED TO BE AN ATTEMPT TO COLLECT A DEBT, BUT ONLY ENFORCEMENT OF A LIEN AGAINST PROPERTY.**

*Id*. at 9.[31]

VI. Discussion.

A. Standing: FDCPA Claim Based on the June 25 Letter.

DONI argues that the Plaintiff lacks Article III standing to bring an FDCPA claim based on

its June 25 letter because her own mortgage broker, Lindmark, requested a payoff amount. (#95 at

6-9); *see* #102 at 6. The court is unpersuaded.

To establish Article III standing, a plaintiff must show an injury in fact caused by the

defendant and redressable by a court order. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423

(2021); *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 372 (1st Cir. 2023). DONI focuses

on "injury in fact" and specifically whether injury in fact here was "concrete." *See*, *e.g.*, #95 at 7.

---

[31] The Plaintiff attests that she "was growing increasingly worried about losing [her] house since the April 4, 2022 letter threatened foreclosure." (#97-25 ¶ 22.)

"Traditional tangible harms…are obviously concrete…. Intangible harms can also be concrete, including when they are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts…." *Webb*, 72 F.4th at 372 (cleaned up) (citations to *TransUnion* omitted); *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016). The intangible-harms inquiry asks whether the plaintiff has identified a close historical or common-law analogue for her asserted injury, although the plaintiff need not identify an exact match. *Webb*, 72 F.4th at 372 (quoting *TransUnion*, 594 U.S. at 424).

Economic injury is traditional tangible harm that is obviously concrete. *See TransUnion*, 594 U.S. at 425; *Webb*, 72 F.4th at 372. The Plaintiff faced a $14,000 assessment on her condo and she was trying to refinance to pay it. *See* Def.SF (#95) ¶¶ 9-10; Pl.R.SDF (#102-2) ¶¶ 9-10. She attests that as a result of her experience with DONI, she was unable to refinance. (#97-25 ¶ 19.) DONI does not argue that this is an insufficiently concrete (or imminent or direct) economic injury.[32] Rather, as noted above, DONI argues that the assertion of an inability to refinance is false because according to the Plaintiff (and to date, the court notes, even according to DONI), the lien was unenforceable. But when the Plaintiff was trying to refinance, DONI had no apparent doubt as to the validity of the lien and was refusing to release it. DONI presents no evidence that in such circumstances, a homeowner would be able to refinance.[33]

---

[32] The summary judgment record does not reveal whether the Plaintiff paid the assessment and if she did, when she paid it and how. The bottom line, though, is that the Plaintiff was unable to pay the assessment through her preferred means -- refinancing.

[33] The Plaintiff attests to emotional distress from DONI's June 25 letter, *see* #97-25 ¶ 20, and argues in her opposition to DONI's motion that emotional distress can qualify as a concrete injury in fact in FDCPA cases. *See* #102 at 12 (citing *Espinosa v. Metcalf*, #21-cv-10356-DJC, 2022 WL 2915954, at *3 (D. Mass. July 25, 2022) (citing *Ben-Davies v. Blibaum & Assocs., P.A.*, 695 Fed. Appx. 674, 676-77 (4th Cir. 2017) (unpublished))). DONI does not address the asserted emotional distress as a matter of fact or law, *see* #106 at 2-3, but because the law is less clear in this regard, *see, e.g.*, *Shields v. Professional Bureau of Collections of Maryland, Inc.*, 55 F.4th 823, 830 (10th

Because the Plaintiff has asserted, and DONI has not adequately rebutted, economic injury, a tangible harm that is obviously concrete, *Ward* and the other cases on which DONI relies are inapposite. They are intangible-harms cases involving the intangible-harms inquiry. The Plaintiff here, unlike the plaintiffs there, does not argue that the bare FDCPA violations qualify as concrete injuries in fact. *See Ward v. Nat'l Patient Account Srvcs. Sols., Inc.*, 9 F.4th 357, 362-63 (6th Cir. 2021) (involving claims that the defendant, "NPAS, Inc.," identified itself only as "NPAS" in violation of 15 U.S.C. § 1692d(6) and § 1692e(14); after concluding that the adequately-pled FDCPA violations did not mirror the intentional intrusion into the private affairs of another, the court addressed the plaintiff's claims of independent concrete harm and rejected them, holding that confusion is insufficient and that the plaintiff could not rely on the cost of retaining counsel to stop the phone calls as economic injury; finding that the plaintiff had not adequately pled that he suffered harm from the additional phone call received after he mistakenly sent a cease-and-desist letter to "NPAS Solutions, LLC," and declining to decide whether an unwanted call can qualify as a concrete injury in fact); *but see id*. at 363-69 (Moore, J., dissenting) (disagreeing as to the pleading deficiency and reasoning that the additional phone call after the plaintiff sent the cease-and-desist letter to the wrong business because of the defendant's failure to properly identify itself was a concrete injury in fact).

Even if this case involved no more harm than the alleged FDCPA violations themselves, DONI's standing analysis is misguided. *Ward* considered whether the putative violations of 15 U.S.C. §§ 1692d(6) and 1692e(14) were closely related to an invasion of privacy, which was the proffered close historical or common-law analogue. *See* 9 F.4th at 362 ("Had Ward claimed, for

---

Cir. 2022); *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 939 (7th Cir. 2022), the court does not address the issue further.

example, that NPAS, Inc. improperly shared personal information with a third party, 15 U.S.C. § 1692b, publicized his debts, *id.* § 1692d(3)-(5), or used language on a publicly viewable envelope that would identify him as a debtor, *id.* § 1692f(8), then Ward's alleged harm would more closely resemble an invasion of privacy.").[34] It is not clear to the court, and DONI does not explain, why an invasion of privacy is the closest historical or common-law analogue for the alleged FDCPA violations here. The Plaintiff's claim is that DONI falsely alleged that she had an obligation to pay money personally and when it discovered that she did not owe any money, it attempted to enforce a "stripped off" lien.

Tellingly, DONI took a different tack in reply, citing *Trichell v. Midland Credit Mgmt.*, 964 F.3d 990 (11th Cir. 2020), and asserting that the Plaintiff here, like the plaintiffs in that case, "'seek[s] to recover for representations that [she] contend[s] were misleading or unfair, but without

---

[34] In the other FDCPA case DONI cites, the court was considering the same proffered analogue and found that the plaintiff had established a concrete injury in fact. *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191-93 (10th Cir. 2021) (involving alleged violations of 15 U.S.C. §§ 1692g(b) and 1692c(c)).

DONI asserts that in *Sagar v. Kelley Auto. Grp., Inc.*, a Telephone Consumer Protection Act ("TCPA") case, Judge Saris ruled that "only 'receipt of **unsolicited** telemarketing text messages…is sufficient to establish a concrete injury in fact.'" (#95 at 7.) But DONI adds "only" and supplies its own emphasis to "unsolicited." It also omits words and important context. In reality, Judge Saris merely "joined the Second, Fifth, Seventh, and Ninth Circuits in finding that, in light of the TCPA, the receipt of unsolicited telemarketing text messages, on its own, is sufficient to establish a concrete injury in fact." *Sagar*, #21-cv-10540-PBS, 2021 WL 5567408, at *4 (D. Mass. Nov. 29, 2021) (discussing most of the TCPA cases cited by DONI, *see* #95 at 8, and others). Judge Saris was not even confronted with **solicited** messages. The plaintiff's cell phone had been on the national do-not-call list since 2004 and he had no business dealings with the defendant since 2015, when he asked one of its managers to place his cell phone on an internal do-not-call list. *See* 2021 WL 5567408, at *1. So, she had no occasion to rule that "only" unsolicited messages suffice.

Similarly, Judge Burroughs in *Campos v. TJX Companies, Inc.*, was considering whether the alleged violations of the Arizona Telephone, Utility and Communication Service Records Act were closely related to the common law tort of intrusion upon seclusion and specific privacy statutes, including the TCPA. #24-cv-11067-ADB, 2025 WL 360677 (D. Mass. Jan. 31, 2025). For the reasons explained above, all of these decisions are inapposite.

proving even that [she] relied on the representations, must less that reliance caused [her] any damages.'" (#106 at 3) (quoting *Trichell*, 964 F.3d at 998). The court agrees that a misrepresentation is a closer historical or common-law analogue than an invasion of privacy.[35] It does not agree that *Trichell* compels a conclusion that the Plaintiff lacks standing to raise an FDCPA claim based on DONI's June 25 letter.

In the first place, *Trichell*, of course, like *Ward*, is an intangible-harms case, involving no more harm than the alleged FDCPA violations themselves, and there is more here. *Contrast Trichell*, 964 F.3d at 997 ("the complaints here do not allege that the collection letters caused Trichell or Cooper any tangible injury. For example, neither plaintiff alleges that he made any payments in response to the defendants' letters -- or even that he wasted time or money in determining whether to do so. Instead, when confronted with the standing issue during oral argument, Trichell and Cooper asserted only intangible injuries, in the form of alleged violations of the FDCPA") *with*, *e.g.*, *Rivas v. Midland Funding, LLC*, 842 Fed. Appx. 483, 486 (11th Cir. 2021) (distinguishing *Trichell* as the plaintiff had alleged tangible injury).

Regardless, there is sufficient evidence of the Plaintiff's "consequential action or inaction" following receipt of DONI's June 25 letter such that her injury is of the same character as an injury from misrepresentation, and the interests protected by her 15 U.S.C. § 1692f(1) claim align adequately with the interests protected by that proffered close historical or common-law analogue. *See Huber*, 84 F.4th at 149 (citations omitted) (§ 1692e). That is, because of DONI's

---

[35] *Trichell* involved claims under not only 15 U.S.C. § 1692f, but also § 1692e, which generally prohibits "false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e; *see also Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 148 (3d Cir. 2023) (misrepresentation was an "apt" analogue to the alleged § 1692e violation); *cf. Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 826 (5th Cir. 2022) (rejecting the § 1692e plaintiff's reliance on invasion of privacy as the analogue).

misrepresentation -- that a payoff would be necessary to secure lien release, *see* #95-2 at 7 -- the Plaintiff was unable to refinance, which was her preferred method of paying the $14,000 condo assessment.[36]

    B. <u>Notice: Bankruptcy Injunction Claim Based on the June 25 Letter</u>.

The court dedicated pages in denying judgment on the pleadings to the question of whether actual notice of the discharge order is required for purposes Count II, the discharge injunction claim, or whether constructive notice is enough. It ultimately assumed without deciding that actual notice was required, and found that an inference that DONI had actual notice of the discharge order was plausible. (#70 at 19-23, 25-29.)

As if writing on a blank page, DONI baldly asserts that the Plaintiff must prove actual notice, and argues and there is no genuine dispute that it lacked actual notice of the discharge order before June 30, 2021, and thus it is entitled to summary judgment as to the bankruptcy injunction claim based on its June 25 letter.[37] (#95 at 9.) The Plaintiff, cognizant of the procedural history, urges the court to conclude that only constructive notice of the discharge order is required, although she argues that there is also a genuine dispute as to actual notice before June 30. (#102 at 12-15.) Finally, in reply, DONI argues that the Plaintiff has not presented sufficient evidence of constructive notice. (#106 at 3-5.)

---

[36] The court recognizes that the summary judgment record here reveals that the Plaintiff was already been working with Lindmark before she received even the "Hello Letter" and that it does not reveal, for example, that she paid Lindmark extra because of DONI's alleged misrepresentations. The court finds that the evidence that the Plaintiff was unable to refinance is sufficient, and moves on to the merits.

[37] To repeat, DONI does not dispute that on June 30, 2021, it learned that the Plaintiff previously had filed for bankruptcy, and that before it sent the October 18 letter, its former employee, Tafoya, reviewed the online bankruptcy docket. *See* Def.SF (#95) ¶¶ 34, 36. There is no issued raised as to adequate notice after June 30 and in particular, at the time DONI sent its October 18 letter. Nor is there any question as to BMPC's notice of the bankruptcy discharge in 2022.

For the sake of completeness, the court notes that neither party has cited any more recent case law addressing the notice requirement for purposes of a discharge injunction claim, and the court's own search has turned up nothing persuasive. However, the court does not need to finally decide this issue, as it agrees that the Plaintiff has not presented sufficient evidence of even constructive notice before June 30 (and as noted, there is no question of adequate notice thereafter).

At the pleading stage of this case, the court found plausible the inference that Carrington received the amended Chapter 13 bankruptcy plan, which stated that its claim would be treated as unsecured and that a discharge order would mean a discharge of its mortgage, *see* #97-4 at 3-4, The court also found plausible the inference that on transfer of the second mortgage loan to DONI, Carrington also transferred its paperwork. (#70 at 26.)

Relevant bankruptcy pleadings were presumably sent, but the summary judgment record does not reveal that Carrington actually received the amended plan or motion for discharge. Regardless, it appears from the summary judgment record that the earliest DONI received any paperwork from Carrington was June 9, 2021, and it does not appear that that "collateral file" included any bankruptcy information. *See* #97-18 at 3.

The summary judgment record does not reveal any relevant, bankruptcy-based communications between DONI and Carrington employees in the relevant time frame (or ever). The Plaintiff has presented no evidence that Carrington has a prior history of selling discharged debts or liens to DONI, such that DONI might have had reason to suspect that a discharge lien was included in the relevant portfolio.

The Plaintiff points to the April 27, Hello letter as evidence that DONI knew about the discharge order, *see* #102 at 14, but she overlooks the evidence that this letter is automatically, system-generated, *see* #97-19 at 31, 35. The invitation to call Faulkner "*[i]f* you have filed for

34

bankruptcy protection…," *see* #95-2 at 5 (emphasis supplied), actually suggests that DONI did not know about the discharge order.

Nobody claims that on the May 11 call, Lindmark or the Plaintiff used the word "bankruptcy." And the Plaintiff does not explain why it would be reasonable to understand the word "modified" (or even "resolved," assuming contrary to the contemporaneous record that was the word used, *contrast* #97-18 at 2 *with* #97-5 ¶ 14) to mean that a discharge order entered and the subject lien was stripped off.

That the Plaintiff had not "heard about this" or "heard anything since 2009" could just as easily mean that Carrington had chosen not to make any collection attempts. The court of course does not know what Segura and Spangler took away from the May 11 call because it has not been presented with competent evidence of their understanding.

The court has, however, been presented with competent evidence of DONI's policy to cease collection activities in order to investigate when it learns that the obligor may have filed for bankruptcy, *see* #101-1 ¶ 7(a); *see also* #95-2 ¶ 14. DONI did not cease collection activities in order to investigate until June 30, *see* #95-2 ¶ 25, suggesting that is the date that it first learned that the obligor may have filed for bankruptcy. There is no evidence DONI previously had violated this policy, continuing collection activities despite knowledge of bankruptcy filings without conducting any investigation.[38]

---

[38] Resisting this conclusion, the Plaintiff relies on the October 18 and dunning and April 4 letters, *see* Pl.R.SDF (#102-2) ¶ 23, apparently to show that DONI and BMPC continued collection activities after June 30. But the evidence shows that before sending the October 18 letter, DONI did actually investigate, albeit concluding that the lien was not avoided. *See* #95-2 ¶ 26; *see also* #97-18 at 4. BMPC also investigated before sending the dunning letter, although it reached the same conclusion. *See* #101-2 ¶¶ 8-9.

The Plaintiff relies on Faulkner's deposition testimony, claiming that he was unable to deny that DONI was on actual notice of the bankruptcy discharge earlier, *see* #102 at 14 (citing #97-19 at 36), but it is not unexpected that the person charged with testifying from his review of records might be reluctant to eliminate the possibility that another person knew something and simply did not write it down in the records he reviewed. The Plaintiff has presented no evidence from the other persons who might have known something but failed to write it down, like Segura and Spangler, or from any Carrington employee responsible for transferring paperwork to, or otherwise communicating with, DONI employees.

That leaves the Plaintiff's argument that there is a genuine dispute whether DONI was on constructive notice of the discharge order earlier because the amended plan and discharge order were "public record." *See* #102 at 14. The Plaintiff cites no case for the proposition that a defendant is on constructive notice of "public record[s]," and while it may well be better practice to do so, she presents no evidence, for example, that it is industry practice to conduct an immediate "scrub" and thorough review of whatever it kicks up, such that the court might have reason to doubt the chronology of events and DONI's lack of swift due diligence here.

Pointing to the mere existence of a scintilla of evidence is not enough to defeat a summary judgment motion, *see John B. Cruz Const.*, 169 F.4th at 95, and the Plaintiff has, if that, pointed to the mere existence of a scintilla of evidence that DONI was on constructive notice of the discharge order before June 30, 2021. As to the discharge injunction claim based on its June 25 letter, the court will enter summary judgment for DONI.

C. Coerciveness: Discharge Injunction Claim Based on the October 18 Letter.

As the court has previously explained, to prove a violation of the discharge injunction, a debtor must prove that the creditor, among other things, acted in a way that improperly coerced or

harassed her. The test is objective, considering the facts and circumstances of each case, including the immediateness of any threatened action and the context in which a statement was made. The debtor need only prove that the creditor's conduct had a coercive effect, not that the creditor acted in bad faith or created all the allegedly coercive circumstances. (#70 at 18) (citations omitted).

Relying primarily on *Best v. Nationstar Mortgage LLC*, 540 B.R. 1 (B.A.P. 1st Cir. 2015) (per curiam), DONI argues that contact with a debtor is not per se prohibited and the discharge injunction is violated by demands for payment, and its October 18 letter was not a demand for payment. (#95 at 12-14.) The court expressly addressed *Best* in denying judgment on the pleadings, *see* #70 at 24, distinguishing the case because DONI and BMPC were, at that time, assuming that the second mortgage lien was stripped off, and the lien in *Best* was valid. (#70 at 24); *see Best*, 540 B.R. at 12 ("…Nationstar was a secured creditor with a lien on the Property…"). Of course, that critical distinction remains, where DONI now does not dispute that the second mortgage lien was stripped off. [39], [40]

A reasonable jury could find from the facts and circumstances of this case, including that the second mortgage lien was stripped off, that the October 18 letter was improperly coercive. The court declines to enter summary judgment for DONI.

---

[39] DONI claims that the Plaintiff "forfeited the issue" by failing to address *Best* (and *Lemieux*, *see supra*), *see* #106 at 7-8, but there was no reason for the Plaintiff to point out what the court pointed out itself already -- that case is readily distinguishable.

[40] DONI also relies on *Lemieux v. America's Servicing Co.*, 520 B.R. 361 (Bankr. D. Mass. 2014), *see* #95 at 14, but the letters in that case were sent after the debtors had already moved out, *see Lemieux*, 520 B.R. at 363, and thus the case is readily distinguishable.

D. Connected to Debt Collection: FDCPA Claim Based on the October 18 Letter, etc.

Under 15 U.S.C. § 1692f, the relevant FDCPA section here, "[a] debt collector may not use unfair or unconscionable means *to collect or attempt to collect any debt*." *Id.* (emphasis supplied). "Debt" means

> any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal family or household purposes, whether or not such obligation has been reduced to judgment.

15 U.S.C. § 1692a(5).

The October 18 letter itself stated that DONI was "attempting to collect a debt" and set out near the bottom the substantial "Amount owing of lien balance as of th[is] date." (#95-2 at 8.) Nevertheless, DONI argues, the letter was not actually an attempt to collect a debt. (#95 at 11.) As DONI points out, the October 18 letter stated that the Plaintiff was not "required" to respond; rather, DONI would have "appreciate[d]" hearing about her "current intentions," including whether she "wish[ed] to retain ownership," "sell," or "abandon [her] interest" in her condo. "Owing" seems synonymous with "due," but true enough, as DONI points out, the letter did not state that payment was "due" or provide a deadline for payment or explicitly threaten consequences for missing the deadline. *See* #95-2 at 8.

DONI asserts that other circuit courts have ruled that letters similar to its October 18 letter were not an attempt to collect a debt, and thus did not trigger FDCPA protections. *See* #95 at 10-11; *see also* #106 at 6.[41] However, several of the relied-upon rulings are actually unfavorable to

---

[41] The cases on which DONI relies were interpreting language that appears in other FDCPA sections, like 15 U.S.C. § 1692e, but not in § 1692f, the relevant section here: "*in connection with the collection of any debt*." The Sixth Circuit in *Estep v. Manley Deas Kochalski*, recognized the textual distinction between, e.g., § 1692e and § 1692f but determined that the distinction did not make a difference. *Estep*, 552 Fed. Appx. 502, 504, n. 1 (6th Cir. 2014). Especially because the parties do not address the textual distinction, the court will follow suit.

DONI,[42] and the cited cases involving rulings favorable to DONI involved dissimilar letters. *See infra*.[43] Furthermore, the general proposition to be drawn from the cases cited is that a communication does not necessarily have to demand payment to be connected with debt collection, *see, e.g., Gburek*, 614 F.3d at 384-85, a principle that helps the Plaintiff, not DONI. The question is whether "an animating purpose" of the communication was "to induce payment" by the debtor-plaintiff:

> Obviously, communications that expressly demand payment will almost certainly have this purpose. But so too might a communication that merely refers the debtor to some other communication that itself demands payment. … Thus, to use the language of § 1692e, a letter that is not itself a collection attempt, but that aims to make such an attempt more likely to succeed, is one that has the requisite connection.

*Grden*, 643 F.3d at 173.

---

[42] *See Simon v. FIA Card Services, N.A.*, 732 F.3d 259, 267 (3d Cir. 2013) (the letters were attempts to collect a debt; "The letters offered the Simons a way to avoid the Rule 2004 examinations and adversary proceedings by paying a reduced amount to settle the debt or by stipulating that the debt was nondischargeable. The letter and notice were an attempt to collect the Simons' debt through the alternatives of settlement -- including by partial payment -- or gathering information to challenge dischargeability. The absence of an explicit payment demand does not take the communication outside the FDCPA"); *Grdn v. Leiken Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011) (the putative motion for default judgment was an attempt to collect a debt, although the incorrect balance statements were not; "we agree with the Seventh Circuit that an 'explicit demand for payment' is not always necessary for the statute to apply") (following *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 384-85 (7th Cir. 2010) (the letters were attempts to collect a debt; as to the first, noting that the plaintiff was in default on her mortgage loan and the letter offered to discuss "foreclosure alternatives" and asked for financial information to initiate that process: "This letter is Litton's opening communication in an attempt to collect Gburek's defaulted home loan -- by settlement or otherwise. Though it did not explicitly ask for payment, it was an offer to discuss Gburek's repayment options, which qualifies as a communication in connection with an attempt to collect a debt")).

[43] The court addresses other dissimilarities below, but starts here by noting the communication at issue in *McIvor v. Credit Control Servs.*, 773 F.3d 909 (8th Cir. 2014), was between a creditor and a credit reporting agency, which is obviously not like a communication with a debtor.

Other general principles to be drawn from the cases, also helpful to the Plaintiff rather than DONI, are that the question of whether a communication was connected with debt collection is one of objective fact, *see Gburek*, 614 F.3d at 386 (quoting *Ruth v. Triumph Partners*., 577 F.3d 790, 798 (7th Cir. 2009)), and that in addition to its content, the context of a communication is critical. *Id*. at 385; *see Ruth*, 577 F.3d at 798-99 (the only relationship between the defendants and the plaintiffs arose out of the defaulted debt and the notice at issue was packaged in the same envelope as a collection letter).

The content of the October 18 letter together with its context create a triable issue as to whether the letter was an attempt to collect any debt in that one "animating purpose" was to induce payment, such that DONI is not entitled to summary judgment. In arguing to the contrary, DONI ignores this critical context:

The Plaintiff defaulted on the second mortgage loan before she filed for bankruptcy and secured the discharge order. When the Plaintiff sought a release of the supposed lien, DONI "advised [Lindmark of the] need [for a] settlement offer," and provided information on "online pay and auto pay." (#97-18 at 2.) DONI also informed Lindmark that "payments were due [since 12/1/03] they just are not being paid." *Id*. at 3.[44] DONI sent the Plaintiff the bona fide error letter, which "correct[ed]" the "amount owing" upward, by about $13,000. (#95-2 at 6); *see* #95-2 at 5. DONI declined the Plaintiff's $28,000 settlement offer, suggesting to Lindmark that it was in

---

[44] *Contrast Bailey v. Security Nat. Servicing Corp.*, 154 F.3d 384, 388-89 (7th Cir. 1998) (the plaintiff had not defaulted again yet and the letter advised him how to avoid another default); *contrast also Lucas v. New Penn Financial, LLC*, #17-cv-11472-ADB, 2019 WL 404033 (D. Mass. Jan. 31, 2019) (the communications concerned modification, not settlement).

DONI's best interest to sell the condo or foreclose.  (#97-18 at 3-4.)[45] And in fact, there was no "lien" to enforce.[46]

As for critical content, as noted, the October 18 letter actually stated that DONI was "attempting to collect a debt,"[47] and it specified the "Amount owing."[48] (#95-2 at 8.) Moreover, the letter stated that DONI "continues to hold a mortgage lien against" and "still retains lien rights as to the property." *Id.* DONI maintains that the claim of enforceability was a "mistake[]." *See* #95 at 11; *see also* #95-2 ¶ 26. But the court fails to see how it can accept Faulkner's characterization of Tafoya's conclusion, as he has no apparent personal knowledge of her state of mind. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a [summary judgment]

---

[45] *Contrast Estep*, 552 Fed. Appx. at 506 (the letter was sent after foreclosure proceedings had already begun and advised the plaintiffs of an intent to transfer ownership of the home after foreclosure to the United States Department of Housing and Urban Development, and that HUD generally requires that no one be living in its properties).

[46] *Contrast Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 17 (1st Cir. 2002) (the lien was valid).

[47] The court acknowledges that neither the presence nor the absence of such language is dispositive. *Gburek*, 614 F.3d at 386, n.3. *Contrast McCready v. Jacobsen*, #06-2443, 2007 WL 1224616, at *1-2 (7th Cir. Apr. 25, 2007) (unpublished) (the letter, sent at the plaintiff's request setting out how his security deposit was applied toward unpaid rent and repairs, stated the exact opposite:  "**IN NO WAY IS THIS TO BE CONSTRUED AS AN ATTEMPT COLLECT** [sic] **UPON THE DEBT OWED**…").

[48] *Contrast Vilinsky v. Phelan Hallinan & Diamond, PC.*, #15-cv-650-JBS, 2015 WL 3767494, at *3 (D. N.J. June 16, 2015) (the notice merely informed the FDCPA plaintiff of a substitution of the plaintiff in the foreclosure action and did not include a debt balance), *aff'd*, 640 Fed. Appx. 139 (3d Cir. 2016).

motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affidavit or declaration is competent to testify on the matters stated").[49]

Conversely, the Plaintiff is not entitled to summary judgment on her FDCPA claim based on DONI's October 18 letter because a reasonable jury could find that it was not an attempt to collect a debt. There may well be evidence at trial to support Faulkner's characterization of Tafoya's conclusion, and while the question is one of objective fact, it is notable that the Plaintiff herself "thought the loan was resolved." (#97-25 ¶ 14.) DONI is also right to point out, *see* #101 at 13, the comparative prominence of the disclaimer on its October 18 letter that it was "**NOT A DEMAND FOR PAYMENT OR A REQUEST FOR PAYMENT OF ANY FUNDS PREVIOUSLY DISCHARGED IN BANKRUPTCY**…." (#95-2 at 8.)[50]

Under *Grden*, *see supra*, DONI might have argued for summary judgment as to its June 25 letter. It is undisputed that the day before this letter was sent, Lindmark asked for a payoff amount. *See* Def.SF (#95) ¶¶ 30-31; Pl.R.SDF (#102-2) ¶¶ 30-31; *see also* #97-18 at 4. DONI does not make that argument, *see* #95, and in any event the court would have rejected it. Unlike in *Grden*, the issue here is not that DONI told the Plaintiff that she had to pay more to secure a release of the

---

[49] Faulkner's assertions regarding employee training and education, *see* #101-1 ¶ 7(a)-(g); *see also* #101 at 11-12 (relying on them to argue that the Plaintiff has not "defeated DONI's bona fide error affirmative defense"), have limited probative value in the absence of evidence that that this is industry standard and that Tafoya was trained and educated consistently with DONI policy and that she followed her training and education here.

[50] DONI's most persuasive citation is to the Sixth Circuit's decision in *Grden*, insofar as the court held that the incorrect balance statements were not an attempt to collect a debt: "….[T]he decisive point is that Leikin made the balance statements only after Grden called and asked for them. The statements were merely a ministerial response to a debtor inquiry, rather than part of a strategy to make payment more likely." 643 F.3d at 173. But the Plaintiff did not ask for the October 18 letter, and the incorrect balance statements in *Grden* do not appear to have followed failed negotiations.

lien than she should have had to pay. The issue is that DONI told the Plaintiff that she had to pay anything at all.

It is the Plaintiff who, apparently, seeks summary judgment as to DONI's June 25 letter. *See*, *e.g.*, #97 at 11. But where it is undisputed that Lindmark asked for a payoff amount, it will be up to the jury to decide whether an animating purpose of the letter was to induce payment.

That leaves BMPC's dunning and April 4 letters, as to which Plaintiff also apparently seeks summary judgment. *See*, *e,g.*, *id*. The court previously addressed the question of whether the Defendants were attempting to collect a "debt" as that term is defined by the FDCPA,[51] and ultimately declined to decide whether the Plaintiff had adequately stated a claim that the Defendants falsely alleged an obligation to pay money personally because, extending the First Circuit's decision in *Arruda*, *see supra*, 310 F.3d at 23, she had adequately stated a claim that the Defendants falsely alleged a security interest, and defense counsel conceded that a security interest is a "debt." (#70 at 35-36, 39-41); *see* #85 at 5-7.

The Plaintiff in essence asks the court to decide what it declined to previously, by finding no genuine dispute that BMPC's dunning and April 4 letters falsely alleged an obligation to pay money personally. However, the court cannot find no genuine dispute. On the one hand, according to the dunning letter itself, BMPC was "trying to collect a debt that [the Plaintiff] owe[d]" DONI and the letter included the "**Total amount of the debt now**." But, on the other hand, the letter included a disclaimer stating that in the event of bankruptcy discharge, then BMPC was not trying to collect a debt, it was only trying to enforce a lien. (#102-17 at 2, 3.)

---

[51] To repeat, in relevant part: "[A]ny obligation or alleged obligation of a consumer to pay money…." 15 U.S.C. § 1692a(5).

Similarly, on the one hand, the April 4 letter warned that "**[i]f [the Plaintiff did] not pay the total past due amount of $69,869.17 and any additional payments that may become due by July 3, 2022, [she] may be evicted from [her] home after a foreclosure sale**." On the other hand, the letter included a disclaimer that it "**SHOULD NOT BE CONSTRUED TO BE AN ATTEMPT TO COLLECT A DEBT, BUT ONLY ENFORCEMENT OF A LIEN**" in the event of bankruptcy discharge. (#102-18 at 8, 9.) The jury will make the determination of objective fact in this regard.

The Plaintiff also relies on the court's prior extension of *Arruda*, arguing that there is no genuine dispute that BMPC's dunning and April 4 letters falsely alleged a security interest. *See* #97 at 10-11, 13. Because there is another genuine dispute, addressed in the next section, the court does not address this issue further.

E. BMPC's Debt Collector Status.

15 U.S.C. § 1692f, as noted, provides that "[a] *debt collector* may not use unfair or unconscionable means…." *Id*. (emphasis supplied). The FDCPA includes a "primary" definition of "debt collector:"

> [A]ny person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6). And it includes a "limited purpose" definition:

> For the purpose of section 1692f(6) of this title, [the] term ["debt collector"] also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.

15 U.S.C. § 1692a(6).

15 U.S.C. § 1692f(6), in turn, prohibits a "debt collector" from

> Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if --
>
> (A) there is no present right to possession of the property…;
>
> (B) there is no present intention to take possession of the property; or
>
> (C) the property is exempt by law from such dispossession or disablement.

*Id*.

Pursuant to the Supreme Court's decision in *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466 (2019), a business that meets the limited purpose definition of "debt collector" is subject to 15 U.S.C. § 1692f(6), but not other sections of the Act. *Obduskey*, 586 U.S. at 474-76. In this case, the Plaintiff has not made a § 1692f(6) claim; she has made a § 1692f(1) claim. *See #27; see also* #68 at 7-8 (concession by plaintiff's counsel). Thus, ostensibly, under *Obduskey*, a finding that the Defendants meet the limited purpose definition of "debt collector" would result in the dismissal of the FDCPA claim.

In deciding the motion for judgment on the pleadings, the court grappled with, and ultimately rejected, the Defendants' limited purpose-"debt collector" argument. In *Obduskey*, the Supreme Court had assumed that the notices sent by that law firm "were antecedent steps required under state law to enforce a security interest" and, this court reasoned, this case "potentially present[s] circumstances that the *Obduskey* Court did not address -- 'what *other* conduct (related to, but not required for enforcement of a security interest) might transform a security-interest enforcer into a debt collector.'" (#70 at 37-38) (first citing *Odbuskey*, 586 U.S. at 480, then quoting *id*. at 480-81 (emphasis in original)). This court also noted that in concurrence, Justice Sotomayor viewed the holding as "rightly cabin[ed]…to the kinds of good-faith actions presented here," adding that if, for example, a firm "went around frightening homeowners with the threat of foreclosure without showing any meaningful intention of ever actually following through,"

"[t]here would be a question" of whether it "was in fact 'a business the principal purpose of which is the enforcement of security interests,'…or whether it was simply using that label as a stalking horse for something else." *Id*. at 33 (quoting *Obduskey*, 586 U.S. at 483-84 (quoting 15 U.S.C. § 1692a(6)).

In its summary judgment papers, DONI does not make a limited purpose-"debt collector" argument on its own behalf, *see* #95; in its opposition to the Plaintiff's motion, however, it makes the argument on BMPC's, *see* #101 at 16. The court finds that McHugh's assertion that "[t]he principal purpose of BMPC's law practice was, at all relevant times, the enforcement of residential mortgage security interests in real property for various clients, including" DONI, *see* #101-2 ¶ 6, creates a triable issue as to BMPC's debt collector status and therefore, it will not enter summary judgment for the Plaintiff as to her FDCPA claims based on the dunning and April 4 letters.

VII. Conclusion.

So much of DONI's motion (#95) that seeks summary judgment on the bankruptcy injunction claim based on its June 25 letter is <u>ALLOWED</u>. In all other respects, the motion is <u>DENIED</u>.

The Plaintiff's motion for partial summary judgment (#96) is <u>DENIED</u>.

May 22, 2026                                   /s/M. Page Kelley
                                               M. Page Kelley
                                               United States Magistrate Judge

46